LAWRENCE V. McCAVITT vs. REGISTRARS OF VOTERS
OF BROCKTON & others.[1]

Plymouth. March 5, 1982. — April 21, 1982.

Present: HENNESSEY, C.J., ABRAMS, LYNCH, & O'CONNOR, JJ.

*Elections*, Recount, Absentee ballot, Secret ballot.

In an election case, the standard for recounting paper ballots was properly applied to a hand recount of punch card ballots to determine the intent of the voters. [836-839]

An electoral candidate's recount petition claiming that certain absentee ballots were improperly counted, without challenging individual absentee ballots, was sufficient to preserve his objection to the validity of the ballots for judicial review. [840]

In an election case, an absentee ballot cast for a candidate in a mayoral election from ward two which was notarized by a candidate for school committee in ward five was properly rejected pursuant to G. L. c. 54, § 94. [841]

In an election case, the judge erred in ruling that the clerk properly rejected an absentee ballot because he could not read the notary's signature and because the expiration date of the notary's commission was missing. [841-842]

In an election case, seven facially valid absentee ballots cast by voters who substantially failed to comply with material provisions of G. L. c. 54, § 92, were improperly counted in the over-all election total. [842-845]

In an election case, three votes cast by voters who followed all the procedures set out in G. L. c. 54, § 92, except that they failed to exhibit their ballots to the notary before voting, and one vote cast by a disabled voter who received assistance in marking the ballot in circumstances in which the notary failed to add a statement as required by G. L. c. 54, § 98, that the voter was unable to write, and in which the voter did not prove that the person assisting was qualified to vote, were properly counted in the over-all election total. [845-846]

In the absence of evidence of fraud or intentional wrongdoing, a voter who has cast an absentee ballot in good faith may not be asked to reveal for whom he or she voted; the right to a secret ballot is not an individual right which may be waived. [846-850]

[1] John J. Lyons, as he is the city clerk, and Paul V. Studenski, the opposing candidate.

Where the result of a mayoral election was placed in doubt by the rejection of seven facially valid absentee ballots because of procedural mistakes, this court ordered a new election rather than compel those absentee voters to disclose the candidate for whom they voted. [850]

CIVIL ACTION commenced in the Superior Court Department on December 9, 1981.

The case was heard by *Ford*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*William F. Galvin & David J. Fine (Jeanne Baker & Leslie J. Rosen* with them) for Paul V. Studenski.

*Stephen H. Oleskey (Richard A. Johnston & Paul F. Saba* with him) for Lawrence V. McCavitt.

*David E. Sullivan*, for Secretary of the Commonwealth, amicus curiae, submitted a brief.

ABRAMS, J. This case involves a dispute over the results of the November 3, 1981, mayoral election in the city of Brockton. On April 5, 1982, we entered the following order. "At issue is the outcome of the November 3, 1981, mayoral election in the city of Brockton. Paul V. Studenski and Lawrence V. McCavitt, the candidates, each claim victory, and each has been declared the victor during different prior proceedings. After the polls closed, Studenski was declared the victor by twenty-three votes. Each candidate asked for a hand recount. See G. L. c. 54, §§ 135 and 135B. At the recount, McCavitt also asserted that '[c]ertain absentee ballots were improperly counted for Paul V. Studenski in that the applications were improper, and there were improper affidavits and returns.' McCavitt, however, did not challenge any specific absentee ballot at the recount. After the hand count was completed, the Board of Registrars of Voters (board) and the city clerk announced that Studenski had won the election by twelve votes.

"On December 9, 1981, McCavitt filed an action in the Superior Court challenging the board's determination that Studenski had won the election. McCavitt asked the judge to declare McCavitt the winner or to declare 'that there has

been a failure to elect a Mayor and order a new election
. . . .' After a trial in late December, 1981, a judge declared
McCavitt the winner by one vote on December 30, 1981.
On January 19, 1982, the judge entered an amended final
judgment declaring McCavitt the winner by four votes.
Studenski appeals. McCavitt filed a cross-appeal. The
board and the city clerk also claimed an appeal. On Feb-
ruary 17, 1982, we granted the parties' joint application for
direct appellate review.

"To determine the outcome of this election, we must
decide whether the same standards that apply to the count-
ing of paper ballots govern a hand recount of punch card
ballots. Next, we must decide whether an absentee ballot is
invalid if the voter fails to comply strictly with the law
governing absentee voting. See G. L. c. 54, § 92. Finally,
we must decide whether the government may compel an
absentee voter, who has cast his ballot in good faith, but
whose ballot is defective because of a failure to comply
strictly with the absentee voting law, to disclose the candi-
date for whom he or she voted.

"We think that the judge correctly ruled that a hand re-
count of punch cards is governed by the same standards
which govern a recount of paper ballots. We also believe
that in the absence of evidence of fraud or intentional
wrongdoing, an absentee ballot must be counted unless the
voter substantially fails to comply with the absentee voting
law. Finally, we conclude that in the absence of evidence
of fraud or intentional wrongdoing, a voter who has cast an
absentee ballot in good faith may not be asked to reveal for
whom he or she voted. Such a requirement burdens the
fundamental right to vote and strikes at the heart of the
American tradition of the secret ballot. If the outcome of
an election depends on good faith absentee voters whose
facially valid ballots must be rejected because of procedural
mistakes, we believe that a new election is preferable to
compelling those voters to disclose the candidate for whom
they voted.

"Applying these principles to the case at bar, we conclude that the judge correctly determined that after the hand count of the punch cards, Studenski had a five vote lead. Further, one facially invalid absentee ballot rejected by the judge, because the notary's signature was illegible, should have been counted for Studenski. Finally, seven of the eleven facially valid absentee ballots challenged[2] by McCavitt at trial should not have been counted. Cast by good faith voters, these seven defective ballots determine the election. We, therefore, reverse the judgment and direct the entry of a judgment ordering a new election." This opinion is in explanation of that order.

1. *Hand recount of punch card ballots.* The city of Brockton uses an electronic voting system. To indicate their selection, voters place punch cards in a special device. While a card is in the device, a metal stylus punches a hole in the space or "chad" beside the name of the candidate whom the voter has chosen. Later, a reading machine counts the votes each candidate received by passing light through the holes the stylus has punched. As light passes through a hole, the machine records each vote.

Sometimes a voter does not completely detach the "chad" from the ballot. If the voter punches the card when it is outside the device, imperfectly applies the stylus to the card while it is in the device, or punches the card with a pen or pencil instead of the stylus, partial perforations, pinholes or depressions may result. If light cannot pass through these indentations, the reading machine treats the ballot as a blank.

On election night, the reading machine counted the votes cast for mayor. According to this count, Studenski received 10,135 votes and McCavitt received 10,112 votes. Thus, Studenski was declared the winner by twenty-three votes. McCavitt and Studenski petitioned for a hand recount. At the recount, the board determined that over 300 ballots that the machine read as blank had been intended as votes for

---

[2] To discover the irregularities, McCavitt canvassed the absentee voters. However, he did not exercise all the challenges.

one of the two candidates. The board concluded that Studenski received 10,291 votes, and that McCavitt received 10,279 votes. The board therefore announced that Studenski had defeated McCavitt by twelve votes.

At trial, the court reviewed over 400 challenged regular and absentee ballots de novo to determine the intent of the voters. Applying the same standard used to count paper ballots, the judge found that Studenski received 10,290 votes, and that McCavitt received 10,285 votes.[3]

On appeal, Studenski claims that the judge did not apply the correct standard for determining the intent of the voters. Instead of using the paper ballot standard, Studenski asserts that the judge should have used the light standard. Under this standard, the judge would have limited his review of the challenged punch cards to a determination of whether unimpeded light can pass through the ballot. If light flows through the card, the judge would record the indentation on the ballot as a vote. If light cannot pass through the card, the judge would treat the ballot as a blank. Studenski claims that when punch card ballots are used, the light standard is the only method for ascertaining the intent of the voters with reasonable certainty. We do not agree.

We resolve "voting disputes, where at all possible, in favor of the voter." *Santana* v. *Registrars of Voters of Worcester*, 384 Mass. 487, 491 (1981). "'The object of election laws is to secure the rights of duly qualified electors and not to defeat them.' This must be borne in mind in the construction of such statutes, and the presumption is that they are enacted to prevent fraud and to secure freedom of choice, and not by technical obstructions to make the right of voting insecure." *Blackmer* v. *Hildreth*, 181 Mass. 29, 31 (1902), quoting from *People* v. *Wood*, 148 N.Y. 142, 147 (1895).

---

[3] These totals include the eleven facially valid absentee ballots that are at issue in this case. In Brockton, absentee ballots are punch card ballots. The absentee ballots were a different color (green) from the ballots used by voters at the polls (manilla).

We agree with the judge that the standard governing hand recounts of paper ballots is appropriate in this case. "The cardinal rule for guidance of election officers and courts in cases of this nature is that if the intent of the voter can be determined with reasonable certainty from an inspection of the ballot, in light of the generally known conditions attendant upon the election, effect must be given to that intent and the vote counted in accordance therewith, provided the voter has substantially complied with the requisites of the election law; if that intent cannot thus be fairly and satisfactorily ascertained, the ballot cannot rightly be counted." *O'Brien* v. *Election Comm'rs of Boston*, 257 Mass. 332, 338 (1926). The use of the paper ballot standard is the most practical method of ascertaining voter intent.[4] Therefore, the judge correctly considered the "character and location of the mark and the conditions attendant upon the election." *Kane* v. *Registrars of Voters of Fall River*, 328 Mass. 511, 518 (1952). In addition, the judge correctly inspected each ballot for patterns that reveal the voters' intent. See *Morris* v. *Registrars of Voters of E. Bridgewater*, 362 Mass. 48, 50-51 (1972); *Munn* v. *Dabrowski*, 335 Mass. 41, 44-45 (1956); *Gilligan* v. *Registrars of Voters of Wilmington*, 323 Mass. 346, 348 (1948). By focusing on a variety of factors, the judge was able to ascertain the intent

---

[4] Jurisdictions which use punch card ballots have not limited their inquiry to a determination of whether light flows through the chad. See, e.g., *Willis* v. *Thomas*, 600 P.2d 1079, 1084-1085 (Alas. 1979) (where voter circled then punched box next to candidates' names to indicate his intent, circling of box alone not a sufficient indication of voter intent); *Hickel* v. *Thomas*, 588 P.2d 273, 274 (Alas. 1978) (punch card ballots marked by pen or pencil instead of punched held valid); *Wright* v. *Gettinger*, Ind.       , (1981) (428 N.E.2d 1212, 1225 [Ind. 1981]) (ballots with chads which were partially attached and that were hanging underneath the cards held valid since these "hanging chads" indicated voters' intent); *Fair* v. *Hernandez*, 116 Cal. App. 3d 868, 879-880 (1981) (where voter fails to punch out a number which corresponds to a candidate and instead punches out a number which is not assigned to any candidate, ballot cannot be counted; but where voter punches out a number which is not assigned to any candidate, and also punches a number which corresponds to a candidate, the ballot must be counted).

of some voters whose ballots would have been treated as blanks under the light standard.

Further, use of the paper ballot standard is consistent with the statutes. Under G. L. c. 54, §§ 135, 135B, a candidate desiring a recount has a choice between a hand or a machine recount. This choice would be rendered meaningless if those counting punch card ballots by hand had to use the light standard, the same standard used by the machine. We cannot assume that the Legislature intended to enact a barren and ineffective statute. See *Baystate Medical Center v. Blue Cross of Mass., Inc.*, 382 Mass. 485, 491 (1981); *Insurance Rating Bd. v. Commissioner of Ins.*, 356 Mass. 184, 189 (1969). Hence, we believe that the Legislature did not intend to limit the hand recount of punch card ballots authorized by G. L. c. 54, § 135B, to a determination whether light passes through the ballot. We therefore affirm the judge's ruling that the standard for counting paper ballots should apply as nearly as possible to a hand count of punch card ballots.

The determination of the legal effect of ballots is a question of law. *Morris v. Registrars of Voters of E. Bridgewater*, 362 Mass. 48, 49 (1972). The recount by the board is not final, and the judge must make a de novo determination of the voters' intent. When this question comes before us, we have the same function. *DePetrillo v. Registrars of Voters of Rehoboth*, 342 Mass. 13, 14 (1961).

After examining the challenged ballots de novo, we conclude that Studenski received 10,291 votes and McCavitt 10,286 votes.[5] Before we consider the challenges to the absentee ballots, Studenski has five more votes than McCavitt.[6]

---

[5] These totals include all the facially valid absentee ballots cast in the election. The facially valid absentee ballots challenged by the candidates are included in the totals. These totals do not include the two facially invalid absentee ballots at issue in this case.

[6] The judge ruled that ballots 14 and 22 should be treated as blanks. We believe that ballot 14 indicated a preference for Studenski and ballot 22 a

2. *Absentee ballots.* We turn to the challenges to two absentee ballots alleged to be facially invalid, and to eleven facially valid absentee ballots. Studenski asserts that McCavitt waived any objection to absentee ballots by failing to make individual protests to specific absentee ballots during the recount proceeding. According to Studenski, the failure to challenge individual absentee ballots is fatal to McCavitt's claim of invalidity. However, a petition which alleges that "absentee ballots and the applications therefor are in error," is sufficient to preserve the issue for judicial determination. *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 667 (1971). McCavitt's recount petition claimed that "[c]ertain absentee ballots were improperly counted for Paul V. Studenski in that the applications were improper, and there were improper affidavits and returns." We conclude that this sufficiently preserved the issue for judicial review.[7]

preference for McCavitt. This change does not affect the result of the election.

We also reject McCavitt's cross appeal. He claims that three ballots in which the chad beside Studenski's name had been punched out should be rejected, because the chad beside the blanks was also punched. McCavitt's suggestion that the ballots were punched outside the machine so that the voter who marked his ballot had little or no idea whether the spaces punched actually corresponded to the name of a candidate is not supported by the record. The clear removal of the chad beside Studenski's name is a sufficient indication of the voters' intent. See *Fair* v. *Hernandez*, 116 Cal. App. 3d 868, 879-880 (1981). Voters are entitled to cast their ballots and have their ballots counted if at all possible. See *United States* v. *Classic*, 313 U.S. 299, 315 (1941). There was no error in counting these votes for Studenski.

[7] Studenski also challenges the court's jurisdiction on the basis that McCavitt's action was not timely filed under G. L. c. 54, § 103. Section 103 "grants the courts a new jurisdiction in equity to deal with matters of absentee ballots, concurrent with their traditional jurisdiction in election contests by way of mandamus." *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 670 (1971). Since G. L. c. 56, § 59, confers jurisdiction irrespective of any filing deadline imposed by G. L. c. 54, § 103, we need not determine the filing deadline under G. L. c. 54, § 103. The plaintiff filed his complaint approximately nine days after the recount. Thus, his action was timely filed under G. L. c. 56, § 59. See *Desjourdy* v. *Registrars of Voters of Uxbridge, supra* (petition for writ of mandamus filed seven days after recount).

a. *Facially invalid absentee ballots.* The judge upheld the clerk's action in rejecting two absentee ballots for facial violations of G. L. c. 54, § 92. Pursuant to G. L. c. 54, § 94, the clerk rejected a ballot from ward two which was notarized by a candidate for school committee in ward five. In addition, the clerk rejected a second absentee ballot because he could not read the notary's signature and the expiration date of the notary's commission was missing. See G. L. c. 54, § 87 (c). Since these ballots did not comply with the statutes, the judge ruled that the rejection of these ballots was proper.

General Laws c. 54, § 94, provides that the clerk shall reject a ballot if the person who notarized the affidavit "is a candidate for election at the election." General Laws c. 54, § 92, states that an absentee ballot is defective "if the official . . . in whose presence it was marked and before whom the affidavit required was executed is a candidate for any office." Reading §§ 92 and 94 together, we conclude that the Legislature intended to bar a candidate for any office in an election from notarizing any absentee ballots in that election. This prohibition applies whether or not the candidate's name appears on the specific ballot that he notarized.

Although his name did not appear on the ballot in ward two, the notary was a candidate for school committee in the Brockton municipal election, held on November 3, 1981. As such, he was barred from notarizing any absentee ballots cast in that election. Pursuant to G. L. c. 54, § 94, the clerk rightly rejected the ballot notarized by this candidate. The decision of the judge sustaining the clerk's action was proper.

But the judge should not have sustained the clerk's rejection of the ballot with the illegible notary signature and the missing commission expiration date.[8] A voter who has cast

---

[8] Studenski offered evidence that the person who signed the ballot was, in fact, a notary whose commission had not expired. The judge erroneously excluded this evidence.

his ballot in good faith should not be disenfranchised "because of the failure of a ministerial officer to perform some duty imposed upon him by law." *Meyer* v. *Keller*, 376 So. 2d 636, 638 (La. App. 1979), quoting from *Champagne* v. *Ackal*, 256 So. 2d 483, 486 (La. App. 1972).[9] We therefore believe that these irregularities must be regarded as immaterial. Since this ballot was cast for Studenski, we must add one vote to Studenski's total. With the addition of this vote, Studenski has 10,292 votes and McCavitt has 10,286 votes. Before we consider the challenges to the facially valid absentee ballots, Studenski is ahead by six votes.[10]

b. *Facially valid absentee ballots.* At issue are the eleven facially valid absentee ballots which the trial judge rejected.[11] General Laws c. 54, § 92,[12] sets out the safeguards

[9] Notaries may not charge a fee for completing the jurat on absentee voting ballot envelopes. See G. L. c. 262, § 43. A notary may be penalized for not properly carrying out the duties imposed by the absentee voting laws. See, e.g., G. L. c. 267, § 1, and G. L. c. 56, § 52. See also Skinner's Notaries' Manual §§ 46-51 (3d ed. 1963); Anderson's Manual for Notaries Public 294 (5th ed. 1977).

[10] Absentee ballots which are facially invalid are not separated from their envelopes. Therefore, it is possible to determine for whom the vote was cast without interrogating the voter.

[11] These eleven facially valid absentee ballots were included in the board's and the judge's totals. See n.5, *supra*. Later the judge deducted those votes from the candidates' totals. See 846-847, *infra*.

[12] General Laws c. 54, § 92, as amended through St. 1976, c. 84, §§ 1, 2, provides in part: "A voter who has received by mail an official absent voting ballot as provided in section eighty-nine may vote by mailing the same to the city or town clerk. The voter shall mark said ballot in the presence of an official authorized by law to administer oaths, and, except as provided in section ninety-eight, of no other person. Before marking the ballot he shall exhibit it to said official, who shall satisfy himself that it is unmarked, but he shall not allow said official to see how he marks it. Except as provided in section ninety-eight, said official shall hold no communication with the voter, nor he with said official, as to how he is to vote. Thereafter the voter shall enclose and seal the same in the envelope provided for by paragraph (1) of subsection (c) of section eighty-seven. He shall then execute before said official the necessary affidavit on said envelope as set forth in said paragraph (1) of subsection (c) and shall enclose and seal the envelope provided for in subsection (d) of said section, and mail the same within the time prescribed in section ninety-three, postage prepaid."

to ensure that absentee ballots represent the will of the voter. *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 671 (1971). The statute requires that before voting an absentee voter shall exhibit his ballot to a notary who must satisfy himself that the ballot has not yet been marked. The voter shall then mark his ballot in the presence of the notary, and no other person. If the voter is blind, disabled, or unable to read English, a qualified voter may also be present to assist the voter in marking his ballot. However, in the case of a disabled voter, the notary must add a statement that the voter is unable to write and the reasons therefor. See G. L. c. 54, § 98.[13] Once the voter has marked his ballot, he must place it in the specially provided envelope and execute the affidavit on the envelope in the presence of a notary. The notary must attest to the affidavit in the presence of the voter. See G. L. c. 54, § 92. See also *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 671 (1971). The voter shall then mail his ballot to the city or town clerk. See G. L. c. 54, § 87 (*d*).

The trial judge found that eleven absentee voters, whose ballots were counted by the clerk and the board, failed to follow the material procedures set out in G. L. c. 54, § 92. Consequently, the judge ruled that the absentee ballots cast by those voters were invalid and had to be rejected.

Studenski concedes that the absentee voters whose ballots were rejected did not strictly comply with G. L. c. 54, § 92. Nevertheless, he claims that these deviations from the statute were immaterial and, therefore, the judge should not have rejected those ballots. To support this argument,

---

[13] General Laws c. 54, § 98, as appearing in St. 1972, c. 52, § 2, provides: "An absent voter who states to the official in whose presence he is to mark his ballot that from blindness or other physical disability or inability to read or to read in the English language he is unable to prepare his ballot may at his discretion be assisted in such marking by any qualified voter whom he may designate or by said official. In either case said official shall add in writing to the jurat a statement of the fact that the voter is unable to write, stating the reason therefor, and shall sign the voter's name on both envelopes."

Studenski points out that there is no evidence that any of these voters were involved in fraud or intentional wrongdoing. McCavitt also does not charge these absentee voters with fraud or intentional wrongdoing.

A citizen who votes in person is not to be disenfranchised for minor irregularities. All that is required is substantial compliance with the election laws. *Chamberlain* v. *Registrars of Voters of Harwich*, 358 Mass. 536, 538 (1970). *Kane* v. *Registrars of Voters of Fall River*, 328 Mass. 511, 518 (1952). *Gilligan* v. *Registrar of Voters of Wilmington*, 323 Mass. 346, 349 (1948).

The same principles govern absentee voting. The right of absentee voting is "as sacred, as much to be protected and favored . . . as the right of voting by personal presence." *Bryan* v. *Barnett*, 35 N.M. 207, 212 (1930). See *Kiehne* v. *Atwood*, 93 N.M. 657, 664 (1979). "The preservation of the enfranchisement of qualified voters and of the secrecy of the ballot, the prevention of fraud, and the achievement of a reasonably prompt determination of the result of the election have been the vital considerations in the development of absentee voting legislation." *Bell* v. *Gannaway*, 303 Minn. 346, 353 (1975). The absentee voting laws enlarge the right to vote. See *Mittelstadt* v. *Bender*, 210 N.W.2d 89, 95 (N.D. 1973); *Kiehne* v. *Atwood, supra*. An absentee voter should not be disenfranchised if he substantially complies with the election law. See *Boardman* v. *Esteva*, 323 So. 2d 259, 269 (Fla. 1975), appeal dismissed, 425 U.S. 967 (1976); *Lanser* v. *Koconis*, 62 Wis. 2d 86, 92 (1974); *Application of Moore*, 57 N.J.Super. 244, 256 (1959).

Six voters marked their ballots outside the presence of a notary.[14] The requirement that a voter mark his ballot in

---

[14] By canvassing the voters who cast absentee ballots, McCavitt discovered these mistakes. The voters described this canvassing. One voter said that two days prior to her receiving a summons from the court, two men representing McCavitt came to her home at around 9 P.M. or 10 P.M. The voter refused to let them in. Through the door, they asked her, "Who did you vote for? Who took the ballots back?" After asking these questions, the men put a paper under her door and asked her to sign it. Out of fear,

the presence of a notary is a significant safeguard against fraud. Cf. *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 671 (1971); *Barks* v. *Turnbeau*, 573 S.W.2d 677, 682 (Mo. 1978); *Kiehne* v. *Atwood*, 93 N.M. 657, 667 (1979). These voters substantially failed to comply with a material provision of G. L. c. 54, § 92.[15]

One other absentee voter substantially failed to comply with G. L. c. 54, § 92. This voter not only marked the ballot in the presence of others besides the notary, but also failed to exhibit the unmarked ballot to the notary before voting. In addition, the voter did not knowingly take an oath before a notary. Further, after completing the ballot, the voter did not mail it directly to the town clerk. Instead, the voter gave it to someone, who turned it over to the notary. The notary also signed the envelope outside the voter's presence. Thus, seven absentee voters substantially failed to comply with the statute. These seven votes, therefore, are improperly included in the over-all total. See 839 & n.5, and 842, *supra*.

Three voters followed all the procedures set out in G. L. c. 54, § 92, except that they failed to exhibit their unmarked ballots to the notary before voting. Each of these voters marked his ballot in the presence of a notary, placed it in the specially provided envelope, and executed the affidavit on the envelope in the presence of a notary. A notary also signed the envelope in the presence of these voters. These procedures are a sufficient guaranty that these voters marked their own ballots. See *Application of Moore*, 57 N.J.Super. 244, 254 (1959). Since this one violation of

---

the voter complied with their request without even reading the paper. Another voter complained that someone representing himself as an attorney for McCavitt called to try to get "information out of [her]."

[15] In *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 671 (1971), the voters failed to mark their ballots in the presence of the notary and the notary signed the affidavit on the envelope outside the presence of the voters. The violations in *Desjourdy* presented two opportunities for fraud. In our case, these voters failed only to mark their ballots in the presence of the notary. Nevertheless, we regard this violation as material.

G. L. c. 54, § 92, in no way impaired the integrity of the ballot, we conclude that these three voters substantially complied with G. L. c. 54, § 92.

One disabled voter received assistance in marking the ballot. See G. L. c. 54, § 98. The notary, however, failed to add a statement as required by G. L. c. 54, § 98, that this voter was unable to write. In addition, the voter did not prove that the person assisting was qualified to vote. See G. L. c. 54, § 98.

Votes counted by election officials are presumed to be legal. The challenger has the burden of overcoming that presumption. See *Kiehne* v. *Atwood*, 93 N.M. 657, 662 (1979). Since the challenger did not introduce any evidence that the person assisting the disabled voter was not qualified to vote, he has not met his burden.

The ballot was marked and the affidavits were executed in the presence of·a notary. These procedures provide adequate safeguards against fraud. A disabled voter who substantially complies with G. L. c. 54, §§ 92, 98, should not lose his or her vote because the notary failed to perform his duty. See 841-842 & n.9 *supra*. Cf. *Boardman* v. *Esteva*, 323 So. 2d 259, 269 (Fla. 1975); *Meyer* v. *Keller*, 376 So. 2d 636, 638-639 (La. App. 1979). Thus, these four ballots were correctly included in the over-all total. See 839 & n.5, and 842, *supra*.

3. *Ballot Secrecy.* In order to preserve ballot secrecy, facially valid absentee ballots are irrevocably separated from their envelopes prior to being counted. The question, thus, is how to reject the seven defective absentee ballots after the votes have been included in the over-all results. The judge compelled the voters who cast these invalid ballots to disclose the candidates for whom they had voted.[16]  After

---

[16] McCavitt admits that one voter did not voluntarily disclose his vote. After this voter declined to reveal the candidate for whom he voted, the judge told him to return to court the next day with an attorney.

McCavitt claims that the other voters voluntarily disclosed their votes. For the reasons stated in the opinion, we need not decide whether all the other voters whose ballots are defective voluntarily revealed their votes.

discovering which candidate had been credited with each invalid vote, the judge subtracted the defective vote from the appropriate candidate's total, and declared the winner. We believe that the judge erred in compelling the absentee voters who made mistakes in the execution of their ballots to disclose for whom they voted.[17]

Courts have required illegal voters to state for whom they voted. See *Wehrung* v. *Ideal School Dist. No. 10*, 78 N.W.2d 68, 69 (N.D. 1956); *Kiehne* v. *Atwood*, 93 N.M. 657, 661 (1979); *Olipint* v. *Christy*, 157 Tex. 1, 8-9 (1957); *Singletary* v. *Kelley*, 242 Cal. App. 2d 611, 613 (1966). See also 8 J. Wigmore, Evidence § 2214 (McNaughton rev. 1961). These courts reason that ballot secrecy is "intended to protect the inviolable secrecy of an honest ballot, and thus the purity of the ballot-box. It was not intended to be used in aid of the schemes of corrupt men to defeat the will of the people." G. McCrary, Elections § 494 (4th ed. 1897). However, that rationale does not apply to voters whose ballots are rejected only because they made a mistake in marking their absentee ballots.

We think there is an important distinction between fraud, intentional wrongdoing, and mere failure to follow directions. See Note, Developments in the Law: Elections, 88 Harv. L. Rev. 1111, 1320 n.109 (1975). See also *Taylor* v. *Pile*, 154 Colo. 516, 522 (1964); *Belcher* v. *Mayor of Ann Arbor*, 402 Mich. 132, 134 (1978). We decline to burden

---

We note, however, that at least three voters were told that they must reveal their votes and that they had no choice.

Further, we do not believe that the record supports McCavitt's claim that voters voluntarily disclosed for whom they voted. One voter claimed, "This is all private stuff." Another voter stated, "I will not answer that question because, as far as I'm concerned, that is illegal. Nobody has the right to know who I voted for." In sum, as we read the record, the voters were shocked and dismayed to learn that they could be compelled by the government to disclose the candidate for whom they cast their vote.

[17] The judge found eleven facially valid absentee ballots defective and subtracted these votes from the appropriate candidate's total. However, only seven of these ballots were defective and should not have been included in the over-all totals. See 844-846, *supra*.

the good faith absentee voter with the possibility that a technical mistake in the execution of an absentee ballot may require the voter to reveal for whom he or she voted. Ballot secrecy enables a voter to make a selection "independently and freely, without being subject to be overawed, intimidated, or in any manner controlled by others, and protects him from any ill will or persecution on account of his vote. The secret ballot is . . . an important and valuable safeguard for the protection of the voter, and particularly the humble citizen, against the influence which wealth and station may be supposed to exercise." G. McCrary, Elections § 488 (4th ed. 1897). See T. Cooley, Constitutional Limitations 605 (2d ed. 1871). Compelling voter testimony in these circumstances is "a kind of inquisitorial power unknown to the principles of our government and constitution, and might be highly injurious to the suffrages of a free people, as well as tending to create cabals and disturbances between contending parties in popular elections." *Johnston v. The Corp.*, 1 S.C.L. (1 Bay) 441 (1795).

Moreover, the procedure followed by the judge conflicts with the intent of the Legislature to expand the use of absentee ballots so that more citizens will participate in the election process. If potential absentee voters think that their ballots will not remain secret, they may not take advantage of the absentee ballot law provisions. In addition, "[m]odern transportation has greatly affected our social and economic lives and many persons find it necessary or convenient to be away on election day. The number of absentee ballots is increasing rather than decreasing." *Lanser v. Koconis*, 62 Wis. 2d 86, 92 (1974), quoting from *Sommerfeld v. Board of Canvassers*, 269 Wis. 299, 302 (1955). We cannot sanction a result which tends to reduce citizen participation in the election process. That is too high a price to pay in a participatory democracy. We therefore conclude that good faith voters may not be asked to reveal the candidate for whom their absentee ballots were cast.[18]

[18] In *McRobbie v. Registrars of Voters of Ipswich*, 322 Mass. 530, 533 (1948), we said that "[a] voter has a privilege not to testify for whom he

Further, ballot secrecy "safeguards the purity of our election process by eliminating the fear of scorn and ridicule, as well as lessening the evils of violence, intimidation, bribery and other corrupt practices which can be incumbent in non-secret elections." *Anderson* v. *Mills*, 664 F.2d 600, 608 (6th Cir. 1981). See 2 J. Weinstein & M. Berger, Evidence par. 5.07[02] (1981); Nutting, Freedom of Silence: Constitutional Protection Against Governmental Intrusions in Political Affairs, 47 Mich. L. Rev. 181, 194 (1948). A voter asked to disclose his vote "could then be subjected to a moral compulsion from his party associates." *Major* v. *Barker*, 99 Ky. 305, 310 (1896). "[I]t would . . . be dangerous to receive and rely upon the subsequent statement of the voters as to their intentions, after it is ascertained precisely what effect their votes would have upon the result." *Briscoe* v. *Between Consol. School Dist.*, 171 Ga. 820, 824 (1931). Indeed, it might be possible that an election could be bought by the use of voter testimony. See *Pennington* v. *Hare*, 60 Minn. 146, 148 (1895); Note, Evidence: Voter Testimony — A Faulty Legislative Response to *Helm* v. *State Election Board*, 33 Okla.L. Rev. 150, 156 (1980). Since ballot secrecy safeguards society's interest in the integrity of elections, we hold that the right to a secret ballot is not an individual right which may be waived by a good faith voter.[19] With-

---

voted." We qualified that statement by noting that "[a] voter casting an illegal ballot has no such privilege." *Id.* at 533-534. However, in *McRobbie*, no illegal voters were compelled to disclose the candidate for whom they voted. The four illegal voters who refused to testify were not compelled to testify. The six illegal voters who did disclose their votes all voluntarily waived their privilege. Thus, the language in *McRobbie* that an illegal voter has no privilege is mere dictum. To the extent that the language in *McRobbie* is inconsistent with our holding in this case, we decline to follow it.

In *McRobbie*, *supra* at 533, we also said that a voter may waive his privilege not to disclose for whom he voted. We expressly overrule that portion of the opinion in *McRobbie*.

[19] Since we view ballot secrecy as safeguarding the integrity of an election, McCavitt's argument that Studenski lacks standing to contest the judge's action in compelling the voters to disclose for whom they voted is without merit.

out the testimony from the seven absentee voters, there is no way to determine the outcome of the November 3, 1981, contest for mayor of Brockton.

Studenski contends that we should arbitrarily divide the illegal votes between the candidates in proportion to the whole vote of each. See *Singletary* v. *Kelley*, 242 Cal. App. 2d 611, 612 (1966). See also G. McCrary, Elections § 497 (4th ed. 1897). Studenski's suggestion "may sometimes work a great hardship, inasmuch as the truth might be, if it could be shown, that all the illegal votes were on one side, while it is scarcely to be presumed that they would ever be divided between the candidates in proportion to their whole vote." *Id.* at § 496. We decline to follow an arbitrary rule which is inconsistent with the theory of a popularly elected representative government. Instead, we believe that "whenever the irregularity or illegality of the election is such that the result of the election would be placed in doubt, then the election must be set aside," and the judge must order a new election. *Callison* v. *Peeples*, 102 S.C. 256, 265 (1915). See *Citizens for a Referendum Vote* v. *Worcester*, 375 Mass. 218, 219 (1978); *McRobbie* v. *Registrars of Voters of Ipswich*, 322 Mass. 530, 533 (1948). See also *Jardon* v. *Meadowbrook-Fairview Metropolitan Dist.*, 190 Colo. 528 (1976); *Stinson* v. *Manning*, 221 Ga. 487 (1965); *Akizaki* v. *Fong*, 51 Haw. 354 (1979); *Application of Moffat*, 142 N.J.Super. 217 (1976).

We, therefore, vacated the judgment declaring McCavitt the duly elected mayor, and directed the entry of judgment ordering a new election.