Betty MAHAFFEY, Petitioner,

v.

The Honorable Kenneth E. BARNHILL, in his capacity as District Court Judge for the First Judicial District, State of Colorado, Acting as District Court Judge for Gilpin County, Colorado; The District Court for the First Judicial District; The District Court for Jefferson County, Colorado; and The District Court for Gilpin County, Colorado, Respondents.

No. 93SA4.

Supreme Court of Colorado,
En Banc.

July 12, 1993.

Holland & Hart, John S. Castellano, Denver, for petitioner.

Gregory N. Ruland, Englewood, for respondents.

Chief Justice ROVIRA delivered the Opinion of the Court.

Three issues arise in this original proceeding: (1) whether ineligible voters can be forced to disclose their votes; (2) whether the trial court lacked jurisdiction to resolve this dispute because trial was commenced more than twenty days "after the joining of issue," § 31–10–1305, 12B C.R.S. (1986); and (3) whether the trial court lacked jurisdiction because a bond was not filed with the clerk of the court as required by section 31–10–1302(2), 12B C.R.S. (1986). We issued a rule to show cause and stayed further proceedings in the district court. We now make that rule absolute in part and discharge in part.

## I

On November 3, 1992, a municipal election was held in Central City, Colorado, to fill a vacancy on its city council. The results of that election are as follows: 79 votes for Betty Mahaffey, 75 votes for Jeff Casey, and 16 votes for Don Tresse. Pursuant to section 31–10–1301, 12B C.R.S. (1986 & 1992 Supp.),[1] Jeffrey Devere, the contestor, filed a statement of election contest on November 13, 1992, requesting the court to set aside the election and to declare a vacancy on the city council. As grounds for his request, Devere alleged that sixteen of the electors who cast ballots were not legally entitled to vote because they were not residents of Central City for twenty-five days immediately preceding the election. The petitioner, Betty Mahaffey, filed an answer to the statement of election contest on November 23, 1992. On December 15, 1992, she filed a motion to dismiss the statement of election contest urging that dismissal was appropriate because tri-

al had not been commenced within the twenty-day period as required by section 31–10–1305 and no bond had been filed with the clerk of the court as required by section 31–10–1302(2). On December 16, the trial court denied the motion, ordered that Devere post a $500 bond by the end of the day, and ordered the trial to begin on December 17.

At the commencement of the trial the court ordered a bifurcated proceeding. During the first stage Devere was required to prove that at least four illegal votes were cast in the election. Assuming that Devere met this burden, at the second stage he would be required to prove that at least four of the illegal votes cast were for Mahaffey.

At the conclusion of the trial the court found that ten of the challenged electors were not residents of Central City for twenty-five days preceding the election, and thus were not qualified to vote in the municipal election. The court also ruled that the individuals who voted illegally could be compelled to testify as to how they voted. A hearing was scheduled for this purpose, but prior to that date Mahaffey filed a petition for writ of prohibition claiming that requiring those individuals to testify would violate article VII, section 8, of the Colorado Constitution (secrecy of the ballot), and that the court lacked jurisdiction because the trial was not commenced within the twenty-day statutory period and the contestor had not filed a bond.

## II

### A

Mahaffey argues that the failure to set the trial of the election contest within twenty days after this controversy was at issue deprived the district court of jurisdiction to hear the matter. We disagree.

---

1. Section 31–10–1301(1) provides:
   The election of any person declared duly elected to any municipal office may be contested by any registered elector of such municipality:
   ....

   (b) When illegal votes have been received or legal votes rejected at the polls in sufficient numbers to change the results; ...
   § 31–10–1301(1), 12B C.R.S. (1986 & 1992 Supp.).

■ Section 31–10–1305, 12B C.R.S. (1986), provides, in pertinent part: "Immediately after the joining of issue, the district court shall fix a day for the trial to commence, not more than twenty days nor less than ten days after the joining of issue. Such trial shall take precedence over all other business in said court."

Here, because no counter-statement was filed, the issue was joined on November 23, 1992, the date of the filing of Mahaffey's answer. Thus, the twenty-day time limitation expired on Sunday, December 13, 1992, which was extended to Monday, December 14, 1992, under section 31–10–1303, 12B C.R.S. (1986). The first stage of the trial was held on December 17, 1992, twenty-five days after the matter was at issue.

■ Section –1305 does not state that jurisdiction is lacking absent the setting of trial within its limitations. In fact, nothing in the statute suggests that it is jurisdictional in nature. Rather, section –1305 recognizes the importance of speedy resolution of election controversies. *See Nicholls v. Barrick*, 27 Colo. 432, 439, 62 P. 202, 204 (1900) (object of election statute requiring judge to fix day for trial not more than twenty days after the issue is joined is to ensure a speedy trial). For example, section –1305 gives election controversies precedence over all other court business. § 31–10–1305, 12B C.R.S. (1986). In light of the fact that we will construe a statute to limit jurisdiction only when that limitation is explicit, *see In re A.W.*, 637 P.2d 366, 373–74 (Colo.1981) ("While jurisdiction may be limited by the legislature, no statute will be held to so limit court power unless the limitation is explicit."), we conclude that section –1305 creates no limitation on the district court's power to hear this controversy. *See Meyer v. Lamm*, 846 P.2d 862, 869 (Colo.1993).

### B

■ Section 31–10–1302(2), 12B C.R.S. (1986), provides:

Before the district court is required to take jurisdiction of the contest, the contestor must file with the clerk of said court a bond, with sureties, to be approved by the district judge, running to said contestee and conditioned to pay all costs in case of failure to maintain his contest.

Mahaffey argues that under this statute a cost bond must be filed before a district court has jurisdiction over an election contest. We disagree.

The statute is unambiguous, and accordingly we must construe it giving the words their commonly accepted and understood meaning. *Woodsmall v. Regional Transp. Dist.*, 800 P.2d 63, 67 (Colo.1990). Under such examination, the intent of the statute is clear: a litigant must file a cost bond before the district court is required to take jurisdiction. The statute does not state that the district court *lacks* jurisdiction absent a cost bond. Thus, the statute is permissive; a district court may require a cost bond before it accepts jurisdiction of the controversy.

This conclusion is consistent with our prior decision in *Nicholls v. Barrick*, 27 Colo. 432, 62 P. 202 (1900), where we examined a statute virtually identical to section 31–10–1302(2). We noted that

[t]he bond for costs required by the statute in proceedings of this character is for the benefit of the contestee. Whether it be given or not in the first instance does not affect the jurisdiction of the court. If none be given when the action is commenced, or if the one accepted be insufficient, it is incumbent upon the contestee to object at the earliest opportunity....

*Id.* at 438, 62 P. at 204.

Accordingly, we find no error with respect to the trial court's conclusion that it had jurisdiction over this controversy.

### III

### A

The trial court held that ten voters in the election were not residents of Central City, and thus were not entitled to vote. The trial court then concluded:

But for the language of the *Porter [v. Johnson*, 85 Colo. 440, 276 P. 333 (1929),] case, it would be my conclusion at this juncture that the election of Ms. Mahaf-

fey was illegal [based on] the language of [section 31–10–1301, 12B C.R.S. (1986 & 1992 Supp.)]. However, I have been persuaded by Mr. Castellano that the *Porter* case still controls and it says, rightfully or wrongly, that the next step must be a showing that those person[s] or at least four of those persons who where found to have voted illegally, voted for Mrs. Mahaffey.

It is my further conclusion ... that under the language of the [*Taylor v. Pile*, 154 Colo. 516, 391 P.2d 670 (1964),] case that [the contestor has] the authority to compel the testimony of those ten persons. I must assume until shown otherwise, that those persons will testify truthfully as to how their votes were cast.

. . . .

Having found that ten voters voted illegally, it is [contestor's] responsibility now to prove that at least four of those voters voted for Mrs. Mahaffey. If that's the case and if you sustain that burden, then there will be a vacancy on the City Council.

The trial court made no finding of bad faith on the part of any of the questioned voters.[2]

In *Taylor v. Pile*, 154 Colo. 516, 391 P.2d 670 (1964), we addressed the issue that controls the resolution of this case. *Taylor* involved an election in which seventy-seven votes in favor of the incorporation of Skyline Village were cast and seventy-seven votes against the incorporation were cast. One elector, Taylor, had cast a ballot although she lived outside the area to be incorporated. She cast her ballot in good faith, believing that she was entitled to vote. Her name was on the list of qualified voters, and there was no challenge to her right to vote. The trial court ordered Taylor to appear and testify as to whether she voted for or against incorporation. Taylor did not testify, and a contempt citation was served upon her. In *Taylor* we agreed with the proposition that

[a] voter who has cast his ballot in good faith cannot be compelled, under the existing law of the State of Colorado, to disclose how he voted, particularly when the voter's name appeared on the registration books and when the voter was not challenged by the election judges.

*Id.* at 522, 391 P.2d at 673. We held that:

The constitutional and statutory right to cast a secret ballot carries with it the accompanying right to refuse to testify as to how or for what the vote was cast. We readily agree that this protection does not extend to the "illegal" voter. But Bonnie Taylor was not an illegal voter.

*Id.* at 523, 391 P.2d at 673.

■ *Taylor* stands for the proposition that where voters who appear on the election rolls vote with the good faith belief that they are eligible to do so, they may not thereafter be required to disclose how they voted—such persons are not "illegal voters." However, the votes casts by such persons are "illegal votes" within the meaning of section 31–10–1301(1)(b), 12B C.R.S. (1986 & 1992 Supp.).

Here, the questioned voters appeared on the list of voters certified by the Gilpin County Clerk and Recorder and there was no legal challenge at the polling place of their right to vote. Thus, to the extent that the questioned voters acted in good faith, they cannot be required to disclose how they voted because they are not illegal voters. *See* Colo. Const. art. VII, § 8. *See McCavitt v. Registrars of Voters of Brockton*, 385 Mass. 833, 434 N.E.2d 620, 630 (1982); Note, *Developments in the Law, Elections*, 88 Harv.L.Rev. 1111, 1320 & n. 109 (1975).

■ Our conclusion that good faith voters cannot be compelled to disclose how they voted is inherently sound. Secrecy after casting a ballot is as essential as secrecy in the act of voting, and should also be preserved as vigorously. Charles B. Nutting, *Freedom of Silence: Constitutional Protection Against Governmental*

---

**2.** Mahaffey asserts, and contestor does not dispute, that each of the questioned voters believed that they were entitled to vote, that there was no legal challenge at the polling place of their right to vote, and that their names appeared on the list of voters certified to vote.

*Intrusion in Political Affairs*, 47 Mich. L.Rev. 181, 191 (1948). Compelling a voter to testify under such circumstances would be the exercise of "a kind of inquisitorial power unknown to the principles of our government and constitution, and might be highly injurious to the suffrages of a free people, as well as tending to create cabals and disturbances between contending parties in popular elections." *Johnston v. Charleston*, 1 S.C.L. (1 Bay) 441, 442 (1795). This privilege is personal, and it is for the voter to determine whether to invoke its protection.

Consequently, the trial court erred in ruling that the voters in question could be compelled to testify.

## B

Contestor argues that under section 31–10–1301(1)(b), 12B C.R.S. (1986 & 1992 Supp.), he is not required to prove that the illegal votes were cast for Mahaffey. Rather, he asserts that he has met his burden by showing that illegal votes were received "in sufficient numbers to change the results," regardless of for whom the votes were cast. In contrast, Mahaffey argues that under our decision in *Porter v. Johnson*, 85 Colo. 440, 276 P. 333 (1929), once it has been proven that illegal votes have been received, the contestor bears the burden of showing which of the candidates received the benefit of the illegal votes.

*Porter* involved an election contest for the mayor of Lafayette where the margin of victory was one vote—229 votes for Johnson, 228 votes for Porter, and 178 votes for Brown. There, we analyzed the election controversy in two steps. Initially, we examined the validity of the ballots cast by the questioned voters. After determining that at least one of the voters was ineligible to vote because she had not been a resident of Lafayette for thirty days preceding the election, we required the contestor to show "which one of the three candidates received the benefit of the illegal vote, and from whose total vote shall be made the deduction of the illegal vote." *Id.* at 441, 276 P. at 333. Noting that there was no testimony in the record concerning for whom the illegal vote was cast, we concluded: "In this state of the record the [illegal vote] could not be deducted from Johnson's total vote, shown by the official canvas, in the absence of testimony that she cast her vote for him." *Id.* at 442, 276 P. at 333. Thus, we affirmed a judgment against the contestor.

■ We agree with Mahaffey that under our decision in *Porter* the contestor bears the burden of proving for whom the illegal votes were cast. However, because the contestor cannot compel the testimony of the ineligible voters, we believe that the burden established by *Porter* is virtually insurmountable in that the available evidence is severely limited. If the contestor requests the ineligible voters to voluntarily disclose the substance of their vote, they will likely refuse to testify concerning the substance of their ballot because their testimony would be harmful to their chosen candidate. If the ineligible voters refuse to testify, the only method of proof would be indirect evidence of their ballot—an alternative which, considering the importance of the franchise, is entirely unsatisfactory. Because no adequate means of proof are available for a contestor, adherence to *Porter*'s holding ignores the legislatively mandated presumption that "[a] result feasible of execution is intended...." § 2–4–201(1)(d), 1B C.R.S. (1973).

■ Accordingly, we hold that under section 31–10–1301(1)(b) "illegal votes have been received ... in sufficient numbers to change the results" when it has been proven that the number of illegal votes meets or exceeds the margin of victory. To the extent that *Porter* requires a contestor to prove the beneficiary of an ineligible vote, it is overruled.

The trial court found that ten voters were not qualified to vote in the municipal election. Because the margin of victory was four votes, contestor has sustained his burden under section 31–10–1301(1)(b). Accordingly, we remand to the district court with directions that it set aside the November 3, 1992, election of Betty Mahaffey to the City Council of Central City.

We therefore make the rule absolute in part and discharge the rule in part and remand this case with directions.