HERBERT L. CONNOLLY *vs.* SECRETARY OF THE
COMMONWEALTH & others[1]
(and two companion cases[2]).

Suffolk. December 8, 1988. — April 10, 1989.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, & O'CONNOR, JJ.

*Elections*, Recount, Absentee ballot. *Practice, Civil*, Election case.

In an election case, this court expressed the view that, even if the certificate
of nomination of a candidate for the office of Governor's Councillor
did not recite his correct legal residence, the misstatement alone would
not have affected his eligibility for the office or rendered him a "fictitious
or nonexisting person" within the meaning of G. L. c. 55B, § 11.
[559-560]

No Federal or State constitutional right of a Republican candidate for the
office of Governor's Councillor "to bring forth" her candidacy was
violated by the circumstance that a recount of the votes cast at the
Democratic primary, and the judicial proceedings attendant thereon, left
uncertain the identity of her opponent until one day before the general
election. [560-561]

In an election case, the legal effect of the protested ballots is a question of
law, and this court must make a de novo determination of the voters'
intent. [561]

Statement of principles guiding this court's determination whether a voter
has substantially complied with the absentee voting laws. [562]

In an election case, six absent voters' ballots were properly counted not-
withstanding the absence of a witness's signature on the inner envelope
enclosing each ballot, as required by G. L. c. 54, § 92, where the six
voters, through error by election officials, had been furnished inner
envelopes designed for categories of voters who did not need their ballots
witnessed; the voters fully complied with the instructions printed on the
inner envelopes used by them; and the genuineness of each ballot could
be ensured by comparing the information on the inner envelope with
that provided on each voter's application for an absentee ballot. [562-564]

---

[1] Robert B. Kennedy and Jody Dow.

[2] Jody Dow *vs.* State Ballot Law Commission, Secretary of the Common-
wealth, Robert B. Kennedy, and Herbert L. Connolly; and Jody Dow *vs.*
Secretary of the Commonwealth, Robert B. Kennedy, and Herbert L. Connolly.

Where, with respect to eleven absent voters' ballot cast by residents of a nursing home, the blank for the voter's signature on the application, the inner envelope, or both, contained a signature followed by initials, the ballots were properly counted even though the person who evidently assisted the voter by signing on his or her behalf had not appended an explanatory statement as required by G. L. c. 54, § 98, inasmuch as the the address and signed affidavit of a witness appearing on the inner envelope enclosing each ballot provided sufficient safeguard against fraud. [564-565]

In an election case, nineteen absent voters' ballots cast by residents of a nursing home were properly rejected for lack of substantial compliance with G. L. c. 54, where, in each instance, the information on the inner envelope enclosing the ballot omitted the voter's address, the location at which the ballot was voted, the date the ballot was mailed, and the voter's signed affidavit and where, although there was testimony that the voters had been assisted in marking their ballots, the ballot materials did not indicate that assistance had been rendered, identify the person who assisted the voter, or explain the voter's inability to write. [565]

Four absent voters, each of whom was personally acquainted with the town clerk who furnished them with absent voters' ballots, substantially complied with the statutory requirements for voting an absentee ballot in person, even though none had first filed a satisfactory application. [566]

Where an absent voter's ballot was obtained from a town clerk by the voter's wife, without the voter's having filed an application; the voter did not complete any part of the ballot or the inner envelope in the clerk's presence; and the ballot was returned to the clerk by mail, the vote was invalid and should not have been counted. [566-567]

In an election case, two absent voters' ballots were properly counted, even though information identifying the voters appeared on the ballots in violation of G. L. c. 54, § 80, where there was no suggestion that the voters had any dishonest purpose in so marking the ballots, and where the identifying marks did not impede understanding of the ballots. [567]

Where the inner envelope enclosing an absent voters' ballot had been witnessed, but had not been signed by the voter in compliance with G. L. c. 54, § 92, the ballot should not have been counted. [567]

Statement of this court's standard governing hand recounts of paper ballots. [568-569]

Statement of the duties of local election officials with respect to their examination of the inner envelopes enclosing absent voters' ballots and their treatment of any ballots that they determine must be rejected as defective. [569-570]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 3, 1988.

On transfer to the Superior Court Department the case was heard by *Elbert Tuttle*, J.

CIVIL ACTION commenced in the Superior Court Department on October 12, 1988.

The case was heard by *Elbert Tuttle*, J.

The Supreme Judicial Court on its own initiative transferred both cases from the Appeals Court.

A separate action commenced in the Supreme Judicial Court for the county of Suffolk on November 22, 1988, was ordered dismissed after consideration by the full court.

*Arthur C. Sullivan, Jr.* (*James C. Dragon* with him) for Robert B. Kennedy.

*William F. Galvin* for Herbert L. Connolly.

*Sanford A. Kowal* for Jody Dow.

*Ruth A. Bourquin*, Assistant Attorney General, for Secretary of the Commonwealth & another.

HENNESSEY, C.J. We review here three actions concerning the Democratic primary election and the general election for the office of Governor's Councillor of the Third District of the Commonwealth. Jody Dow was the Republican candidate. Herbert L. Connolly and Robert B. Kennedy were the two candidates in the Democratic primary, which was held on September 15, 1988. After a recount of the results of the primary election, Kennedy was determined to be the winner by a margin of one vote.

Connolly commenced an action before a single justice of this court, challenging the results of the recount. The matter was transferred by the single justice to the Superior Court for trial. A judge in the Superior Court, after trial, declared Connolly to be the winner of the primary election, and declared that the general election to be held on November 8, 1988, between Kennedy and the Republican candidate, Dow, would be null and void. The judge directed the Secretary of the Commonwealth (Secretary) to hold a special general election between Dow and Connolly within sixty days. Kennedy appealed to the Appeals Court and successfully obtained a stay of the Superior Court judgment, thus postponing the proposed special

general election between Dow and Connolly, and allowing the scheduled general election between Dow and Kennedy to proceed. Connolly filed a cross appeal. We transferred the appeals to this court on our own motion. A single justice of this court entered a preliminary injunction restraining the Secretary from transmitting the results of the November 8 general election for this office, in which Kennedy prevailed over Dow, to the Governor and the Executive Council for certification.

From the recount of the Democratic primary, it was determined that 14,691 uncontested votes were cast for Kennedy, and 14,690 uncontested votes were cast for Connolly.[3] At issue before this court were 116 contested votes, of which fifty were absentee ballots and sixty-six were "punched" ballots submitted by voters at the polls. On December 23, 1988, this court entered an order declaring Kennedy the winner of the primary and the general election, and dismissing the actions of Dow. This opinion is pursuant to our order.

1. *Dow's Claims.*

We first address the claims Dow raises in her two actions and determine that none has merit. Dow filed an objection with the State Ballot Law Commission (commission), in which she sought to challenge Connolly's appearance on the general election ballot in the event Connolly was determined to be the Democratic nominee. Dow's objections were (1) that Connolly's certificate of nomination did not recite his correct legal residence; (2) that Connolly was not a properly registered voter of the city of Newton, despite a certificate otherwise; and (3) that Connolly became a fictitious or nonexisting person within the meaning of G. L. c. 55B, § 11 (1986 ed.), by alleging that he lived at the Newton address. Because we have determined that Kennedy was properly the Democratic nominee, Dow's claims of error against the commission are moot. We

---

[3] We arrive at the figure of 14,691 uncontested votes cast for Kennedy after we subtract the twenty-five challenged punched ballots from the 14,716 votes certified by the Secretary. We arrive at the figure of 14,690 uncontested votes cast for Connolly after we subtract the twenty-five challenged punched ballots from the 14,715 votes certified by the Secretary.

add that, if we had to reach the merits of the issues, we would decide that the commission properly overruled Dow's objections. See *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943). The only residency requirement for the office of Governor's Councillor is that the candidate reside in the Commonwealth for five years. Art. 16 of the Amendments to the Massachusetts Constitution. There was no allegation that Connolly had not been a resident for that period. Therefore, even if Connolly did not live in Newton, he nonetheless would have been eligible for the office. Furthermore, even if Connolly's listed address was not his legal address, this fact alone did not make him a "fictitious or nonexisting person" within the meaning of G. L. c. 55B, § 11. Connolly appeared before the commission and testified under oath that he was Herbert L. Connolly, and that he was the person who ran in the Democratic primary for Governor's Councillor. The commission stated, pursuant to G. L. c. 55B, § 11, that it was satisfied that Connolly was a living person, that it was convinced of his identity, and that he was thus not a "fictitious or nonexisting person." We conclude that the commission's final determination in the matter was based on substantial evidence and contained no error of law. See G. L. c. 55B, § 4 (c. 30A applies to decisions of the commission); *Trustees of Forbes Library* v. *Labor Relations Comm'n*, 384 Mass. 559, 569 (1981) (interpreting provisions of c. 30A).

Dow also claimed, in a separate action against the Secretary, that the nullification and subsequent holding of the general election between herself and Kennedy confused voters, and thereby violated her right "to bring forth" her candidacy to the public. Dow's action against the Secretary was pending before the single justice of this court at the time the full court heard arguments in Connolly's action against the Secretary and in Dow's action against the commission. Dow, as a party in Connolly's action, addressed and fully briefed for the full court the issues she raised in her complaint before the single justice. After examining the merits of these issues, the full court dismissed the case. Dow essentially argues that the circumstances attending the general election of November 8, 1988, were

unfairly prejudicial to her. She notes that the Superior Court judgment declaring the general election between herself and Kennedy null and void was entered on November 1, 1988. The order of the single justice of the Appeals Court granting a stay of this judgment and allowing the general election to go forward, she points out, was entered on November 7, 1988. Dow claims that the uncertainty as to whether the general election between herself and Kennedy would take place confused voters and harmed her candidacy. Consequently, she claims, her rights under the Massachusetts and Federal Constitutions were violated. We disagree. It is patently clear that her opponent, Kennedy, labored under the same difficulty which she asserts. It is also clear, therefore, that the special election she seeks as a remedy, which would merely be a repeat of the contest between herself and Kenendy, is not warranted.

2. *Preliminary Considerations.*

We turn now to the controversy between Kennedy and Connolly. We make several preliminary observations. First, the determination of the legal effect of the ballots is a question of law. *McCavitt* v. *Registrars of Voters of Brockton,* 385 Mass. 833, 839 (1982). *Morris* v. *Registrars of Voters of E. Bridgewater,* 362 Mass. 48, 49 (1972). Second, this court must make a de novo determination of the voters' intent. *DePetrillo* v. *Registrars of Voters of Rehoboth,* 342 Mass. 13, 14 (1961). Finally, we point to a meaningful distinction between the contested absentee ballots and the contested "punched" ballots, in that all of the contested punched ballots are before us, but the only contested absentee ballots which are before us are those which were rejected by local election officials as not valid. The envelopes for all contested absentee ballots are before us for our consideration on the issue of validity, but it follows that the effect of any absentee ballots which we conclude were wrongfully counted is conjectural. Thus, in order to prevail, one of the candidates must show a winning margin of at least one vote more than the number of absentee ballots wrongfully counted.

3. *The Absentee Ballots.*

We consider now the issue of the validity of fifty challenged absentee ballots.[4] General Laws c. 54, §§ 86-103 (1986 ed.), regulate absentee voting. The challenged absentee ballots admittedly do not strictly comply with the technical requirements of the absentee voting laws. The Legislature, however, has not mandated strict compliance, and has directed courts not to reject a ballot for an "immaterial addition, omission, or irregularity." G. L. c. 54, § 97. In keeping with this statement of legislative intent, we have reasoned that "an absentee voter should not be disenfranchised if he substantially complies with the election law." *McCavitt* v. *Registrars of Voters of Brockton*, *supra* at 844. To determine substantial compliance, we look to the purposes of the absentee voting laws, which we have determined to be (1) the enfranchisement of qualified voters, (2) the preservation of ballot secrecy, (3) the prevention of fraud, and (4) the achievement of a reasonably prompt determination of election results. *Id.* We note that there are no allegations of fraud in the present case. With these principles in mind, we review the fifty challenged absentee ballots. Most of these ballots can be classified into groups and accordingly we discuss them in this fashion.

a. The first of these groups consists of six voters, five of whom are from Marlborough (we will refer to the group as

---

[4] Connolly argues that the judge should not have admitted nineteen of these fifty absentee ballots because he claims that Kennedy waived any objections to the ballots by not filing a recount petition and by not objecting to these particular ballots during the recount. In *McCavitt*, we held that a candidate who challenges certain ballots in a judicial proceeding need not object to those specific ballots during a recount proceeding. *McCavitt, supra* at 840. Instead, we determined that a general allegation by a challenger that " 'absentee ballots and the applications therefor are in error,' is sufficient to preserve the issue for judicial determination." *Id.*, quoting *Desjourdy* v. *Registrars of Voters of Uxbridge*, 358 Mass. 664, 667 (1971). Connolly contends that *McCavitt* is distinguishable because there the challenger filed a recount petition and Kennedy did not file such a petition here. We do not think this is a meaningful distinction, especially in light of the fact that a court may order the production of ballots other than those specifically recorded as protested at the recount. G. L. c. 54, § 135, twelfth par. We conclude that the judge properly admitted these ballots and considered the issues they raise.

the Marlborough voters), who failed to have their ballots properly witnessed. The ballots were held valid by election officials, and we agree with their rulings, because the voters substantially complied with the election laws. A voter who is within the United States and whose name is not on the list of permanently disabled voters is required by G. L. c. 54, § 92, both to mark the ballot, and to execute an affidavit on the inner envelope in which the ballot is placed, in the presence of a witness. The section then requires the witness to sign the inner envelope, and provide his or her address. In contrast, a voter who is outside the United States, or whose name is on the list of permanently disabled voters, is not required to have a witness. G. L. c. 54, § 92. The applications for absentee ballots by the Marlborough voters indicate that they fit neither exempt category and thus needed to comply with the witness requirement. These voters, however, received "C" inner envelopes, designed for absentee voters who do not need their ballots witnessed. These inner envelopes, therefore, did not contain a witness requirement, or a printed area to allow a witness to sign and swear as to the method the ballot was marked. Therefore, although none of the inner envelopes of the Marlborough voters was properly witnessed as required by § 92, the Marlborough voters nonetheless fully complied with instructions on the inner envelopes.

We have noted that the witness requirement is a "significant safeguard against fraud." See *McCavitt, supra* at 844-845 (interpreting G. L. c. 54, § 92, as amended through St. 1976, c. 84, §§ 1, 2, which required a notary rather than a witness). We have also stated, however, that a good faith voter should not be disenfranchised because of an error by election officials. *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 283 (1932). See *McCavitt, supra* at 841-842, 846. Here, the voters completely and accurately filled out the ballot materials sent to them; the error was that of the election officials. Furthermore, there are adequate safeguards against fraud present in these instances even without the witness requirement. The completed "C" inner envelopes each contain the voter's address, the location where the ballot was voted, the date the ballot was mailed,

and an affidavit signed by the voter. It is possible to compare this information, notably the signature, with information provided in each voter's application for an absentee ballot, and thereby to ensure that the person who applied for the ballot actually received and voted that ballot. The Marlborough votes were properly counted.

b. We conclude that a group of eleven absentee votes from a nursing home in Brighton (Brighton voters) were also properly counted. The blank for the voter's signature on the application, inner envelope, or both, of each of these voters contains a signature followed by initials. Each of the inner envelopes is complete and has been properly witnessed. An inference was warranted that a witness signed the affidavit on the voter's behalf and initialed the signature because the voter was unable to sign the affidavit. General Laws c. 54, § 98, allows a voter who is unable to prepare his or her own ballot to receive assistance in marking the ballot. The person who assists is then required to provide a statement explaining why the voter is unable to write, and to sign the voter's name on the inner envelope. G. L. c. 54, § 98.[5] The Brighton inner envelopes and applications technically violate § 98 because the person who assisted the voter did not add the required statement. The failure to add a § 98 statement that a voter is unable to write, however, does not, by itself, invalidate a ballot. See *McCavitt, supra* at 846. Here, the initials after the signatures are a sufficient indication that the voter had an agent sign on his or her behalf.[6] Furthermore, the address and signed affidavit of a

[5] Section 98, on its face, allows a voter to receive assistance only in preparing a ballot, and does not specifically allow for assistance in signing an application for an absentee ballot. We believe the Legislature intended to allow a voter to receive assistance, subject to requirements of § 98, in completing a ballot, an application, or both. Cf. G. L. c. 54, § 89A (allowing parent of specially qualified voter or voter attending institution of higher education to apply for absentee ballot on voter's behalf).

[6] None of the inner envelopes or applications contains a printed space allowing a person who assists the voter to explain why the voter may be unable to write. Cf. G. L. c. 54, § 103E. Adding this provision would clarify the duties of persons who assist voters.

A further revision of the inner envelopes is necessary. Section 92 (*a*) specifically allows a witness to communicate with a voter as to how the

witness on each of the inner envelopes provides a sufficient safeguard against fraud. These eleven absentee ballots from Brighton were properly counted.

c. We next examine nineteen ballots from a Lowell nursing home (Lowell voters). Election officials determined that the ballots should not be counted. We conclude that the ballots were facially invalid and that it was proper not to count them. See G. L. c. 54, §§ 94, 135, third par. As in the case of the Marlborough voters, election officials incorrectly sent these voters "C" inner envelopes which do not require witnesses. Unlike the inner envelopes from the Marlborough voters, which were complete, the inner envelopes from each of the the Lowell voters contain only the voter's name in the space entitled "voter's name printed." The envelopes, therefore, lack the voters' address, the location where the ballots were voted, the date when the ballots were mailed, and most importantly, the voters' signed affidavits. Furthermore, there was testimony that the Lowell voters were assisted, as were the Brighton voters, in marking their ballots. The Lowell ballot materials, however, unlike the Brighton ballot materials, contained nothing to indicate this assistance, nothing to identify the person who assisted the voter, and no explanation why the voter was unable to write. The potential for fraud in such circumstances is too great. These nineteen Lowell voters did not substantially comply with requirements of c. 54, and their ballots properly were not counted.[7]

---

voter wishes to vote if the witness is assisting the voter under § 98. The "R" inner envelopes which are designed for witnessed absentee ballots, however, do not appear to allow a witness to assist the voter in marking the ballot. Instead, the inner envelopes require the witness to swear, with no apparent exceptions, "I had no communication with the voter as to how he or she was to vote." These inner envelopes, therefore, should be revised to comply with the statute.

[7] Chapter 54 provides a scheme to minimize the risk that ballots of nursing home residents will be invalidated because of improper witnessing or assistance. The statute provides for an election official to deliver ballots to residents of a "[d]esignated health care facility," to witness a voter's marking of the ballot and execution of the required affidavit, to provide assistance if necessary, and to return the ballot to the city or town clerk. G. L. c. 54, §§ 89 (*a*), 92 (*c*).

d. A group of five voters received absentee ballots without first filing applications requesting the ballots. All five ballots were counted by election officials. We agree with these decisions as to all but one voter, who we conclude failed to comply substantially with the election laws. Section 89 of c. 54 prohibits the delivery of an absentee ballot unless the voter has filed an application and has been certified by election officials. A voter, however, may appear in person before a city or town clerk, request an application, and, if the clerk is satisfied with the completed application, receive an absentee ballot immediately. G. L. c. 54, § 91. The completed ballot will be valid if the voter, without removing the ballot from the office of the clerk, marks the ballot and signs it in the presence of the clerk. G. L. c. 54, § 92 (*b*). Two voters in this group of five telephoned their town clerk, who brought the absentee ballots and necessary envelopes to their home. The clerk knew both voters personally. There was testimony that both voters were disabled. The voters marked the ballots and signed the inner envelopes in the clerk's presence. The clerk signed the envelopes as witness, and returned the completed ballot materials. Two other voters in this group appeared before town clerks who knew them personally, and, in their presence, completed the ballots and inner envelopes which the clerks witnessed. Although none of these four voters had first filed a satisfactory application, the fact that each was known personally by the town clerks, and that each fully completed a ballot and inner envelope in a clerk's presence provides, we believe, a "sufficient guaranty that these voters marked their own ballots." *McCavitt, supra* at 845. We therefore conclude that these four voters substantially complied with the requirements for voting an absentee ballot in person.

We disagree, however, with the election officials' decision as to the final voter in this group. This voter's wife requested and received a ballot from the town clerk without his having filed an application. The voter did not complete any part of the ballot or the inner envelope in the clerk's presence. The clerk later received the ballot by mail. Because there are insufficient procedural guarantees that the voter received and marked

this ballot, we conclude that the vote is invalid, and should not have been counted.

e. We conclude that two voters from Newton whose signatures and addresses appear on their absentee ballots substantially complied with the election laws. The statute forbids a voter from placing "on a ballot any mark by which it may be identified." G. L. c. 54, § 80 (1986 ed.). We have determined, however, that identifying marks do not necessarily invalidate a ballot unless they are "made intentionally and with dishonest purpose." *Chamberlain* v. *Registrars of Voters of Harwich*, 358 Mass. 536, 538 (1970). *Hall* v. *Barton*, 290 Mass. 476, 481 (1935). There was no suggestion that these voters had any dishonest purpose; rather, the marks appear to be an "inadvertent or careless irregularity." *Chamberlain, supra* at 540. Although some of our earlier decisions may appear to require a different conclusion, these decisions are distinguishable from the present case because they involved identifying marks which qualify the voter's position. See *Chamberlain, supra*; *Munn* v. *Dabrowski*, 335 Mass. 41, 46-47 (1956). The marks of the Newton voters do not impede the understanding of their ballots. These ballots were properly counted.

f. We treat the remaining seven absentee ballots summarily. The ballot materials concerning five of these votes contain only minor irregularities. The parties do not dispute the election officials' decisions regarding these ballots, and we conclude that these five voters substantially complied with the election laws. Of the two remaining ballots, one came to the judge sealed in a properly witnessed and executed inner envelope. Evidence indicated that the voter was fully eligible to vote. The ballot, however, as stipulated by the parties, had not been counted either in the original count or the recount. The ballot, which fully complied with the election laws, clearly was inadvertently not counted. The ballot should be counted, and a vote added to Kennedy's total. Finally, the inner envelope for the last of these seven ballots, although witnessed, had not been signed by the voter. See G. L. c. 54, § 92. This ballot should not have been counted.[8]

---

[8] The judge ruled that one in-person ballot was properly counted. The judge found that, although the voter's name did not appear on the voting

g. To summarize, we have concluded that, of the fifty absentee ballots, twenty-eight ballots were properly counted; nineteen ballots were properly not counted; one ballot which was not counted should have been;[9] and two ballots which were counted should not have been included in the tally. As we stated early in our discussion of absentee ballots, we have no way of ascertaining for whom these two votes were cast. At this point, therefore, before we turn to the hand count of the punch cards, the validity of the primary election is conjectural to the extent of the two votes invalidly cast. If the "winning" candidate prevails by less than three votes, under our ruling in *McCavitt*, there must be a new primary election. *McCavitt, supra* at 848, 850.

4. *The "Punched" Ballots.*

We next review sixty-six contested votes which were recorded from "punched" ballots submitted by voters at the polls.

We have examined the ballots in light of the standard governing hand recounts of paper ballots. See *McCavitt, supra* at 838, 839. "The cardinal rule for guidance of election officers and courts in cases of this nature is that if the intent of the voter can be determined with reasonable certainty from an inspection of the ballot, in light of the generally known conditions attendant upon the election, effect must be given to that intent and the vote counted in accordance therewith, provided the voter has substantially complied with the requisites of the election law; if that intent cannot thus be fairly and satisfactorily ascertained, the ballot cannot rightly be counted." *O'Brien* v. *Election Comm'rs of Boston*, 257 Mass. 332, 338 (1926). We focus on a variety of factors in an attempt to ascertain the voters' intent (*McCavitt, supra* at 838-839) including the "character and location of the [punch]" (*Kane* v. *Registrars of*

---

list for the ward and precinct in which she voted, evidence indicated that the voter had moved recently, and thus was properly allowed to vote by an election official. See G. L. c. 51, § 1. We agree with the judge's ruling.

We have consistently referred to the total as fifty "absentee" ballots. The above makes it clear that there are actually forty-nine absentee ballots, and one in-person ballot.

[9] This vote was cast for Kennedy and is added to his total in the tally included in part 5 of this opinion.

*Voters of Fall River*, 328 Mass. 511, 518 [1952]) and any patterns that reveal intent (*Morris* v. *Registrars of Voters of E. Bridgewater*, 362 Mass. 48, 50, 51 [1972]).

We did not count any ballot as a valid vote unless at least a majority (three) of the quorum determined that the intent of the voter had been adequately demonstrated. We have concluded that seventeen of these votes were for Kennedy,[10] fourteen of them were for Connolly,[11] and thirty-five were blanks.[12]

5. *Conclusion.*

In sum, we conclude that Kennedy prevailed by a margin of five votes, and this, of course, exceeds the necessary minimum margin of three votes. Our starting point showed 14,691 uncontested ballots for Kennedy and 14,690 uncontested ballots for Connolly. We have added one vote which we have seen was inadvertently not counted, and which was cast for Kennedy. Kennedy prevailed by a margin of three votes (seventeen to fourteen) on the punched ballots. The ultimate totals are 14,709 for Kennedy and 14,704 for Connolly.

We have commented, *supra*, that absentee ballots which were held to be valid and allowed to be counted by local officials have introduced a conjectural element into the final tally to the extent that we determine the ballots were not valid and should not have been counted. We now emphasize that election officials at the level of the original ballot count have no discretion as to the statutory requirements for a valid absentee ballot. Section 94 of c. 54 requires election officials at this level to enforce the procedural protections of c. 54 against fraud in absentee ballots. This section directs an official, before the ballot is separated from the inner envelope (1) to examine the affidavit on the inner envelope, (2) to compare the signature on the inner envelope with the signature on the absentee ballot

---

[10] We determine that the exhibit numbers of the Kennedy votes are 18, 20, 24, 25, 30, 32, 33, 35, 37, 40, 42, 45, 48, 53, 54, 57, and 64.

[11] We determine that the exhibit numbers of the Connolly votes are 3, 4, 9, 11, 26, 28, 31, 43, 44, 46, 50, 52, 66, and 69.

[12] We determine that all of the exhibits from numbers 3 through 69, except those listed in nn. 10 and 11 above, were blanks. There was no ballot identified as exhibit 16.

application (with an exception for voters who receive assistance in signing under § 98), and (3) to ensure in general that the inner envelope complies with all of the requirements of § 92, which include the witnessing requirements. If the inner envelope fails to meet any of these unambiguous requirements and is therefore facially invalid, see *McCavitt, supra* at 841-842, the official must mark the envelope, *without* removing the ballot it contains, "Rejected as Defective." G. L. c. 54, § 94. Such envelopes are set aside, and are not further examined unless there is a recount. G. L. c. 54, § 135. Even on recount, the ballots are not separated from the facially invalid inner envelopes, regardless of the registrars' opinion of the ballots' validity. *Id.* Because the ballots are not separated from their inner envelopes, cf. G. L. c. 54, § 95 (inner envelopes not marked "Rejected as Defective" are separated irrevocably from ballots), the statutory procedure minimizes the potential for conjectural votes.

Here, the vast majority of the envelopes of the absentee ballots were facially invalid. Only the election officials from Lowell followed the correct procedure under § 94 of marking the inner envelope "Rejected as Defective" and leaving the ballot sealed in the envelope until the recount. Although we reached the same result as the election officials in the majority of the absentee ballots, we had the benefit of testimony and findings from the judge below as to the circumstances of the ballots' execution. If we had reached a different result in a few more ballots, a new primary election would have been necessary. We raise this issue of the election officials' statutory lack of discretion at the level of the original count, therefore, to minimize this possibility in the future.[13]

---

[13] See also our suggestions in note 6, *supra*, for necessary revision of the printed forms on envelopes and applications for absentee ballots.