NICHOLAS A. FYNTRILAKIS *VS.* CITY OF SPRINGFIELD
& others.[1]

No. 99-P-1164.

Hampden. July 14, 1999. - July 29, 1999.

Present: KASS, GILLERMAN, & LENK, JJ.

*Elections,* Primary, Recount, Voter residency. *Practice, Civil,* Election case.
*Statute,* Construction.

An action challenging the results of a primary election was remanded for the
taking of evidence relevant to a determination whether the challenged vot-
ers met municipal residency requirements at the time they voted. [466-474]

CIVIL ACTION commenced in the Superior Court Department on
June 8, 1999.

The case was heard by *Tina S. Page,* J.

*Peter Sacks,* Assistant Attorney General (*James S. Whitcomb,*
Assistant Attorney General, with him) for Secretary of the
Commonwealth.

*Paul S. Weinberg* (*William A. McDermott, Jr.,* with him) for
Jack Keough.

*Raipher D. Pellegrino* for the plaintiff.

*Harry P. Carroll,* Deputy City Solicitor, for city of Springfield,
was present but did not argue.

*Susan C. Phillips,* City Solicitor, for city of Chicopee, was
present but did not argue.

LENK, J. A special Democratic primary was held on May 25,
1999, in the Ninth Hampden District in order to select a

---

[1]The board of election commissioners of Springfield and the secretary to
the board; the city of Chicopee, its board of registrars, and the clerk of the
board; the Secretary of the Commonwealth (Secretary); Jack Keough; and
Christopher Asselin. Keough was named as a "party of interest" and
intervened as a defendant. Christopher Asselin, the last-place candidate, was
also named as a "party of interest," but did not participate in the Superior
Court proceedings.

Fyntrilakis *v.* City of Springfield.

Democratic party candidate for the special election which was to occur on June 22, 1999, for the State Representative's seat. Jack Keough initially won the primary by thirty-one votes; after a recount, he was determined to be the winner of the primary by a margin of thirty-two votes. Nicholas A. Fyntrilakis, the second-place finisher, brought an action in the Superior Court challenging the results of the election (see note 1, *supra*). He alleged, among other things, that forty-nine[2] voters whose names appeared on an inactive voters list were permitted to vote without first completing affirmations of continuous residence as required by 950 Code Mass. Regs. § 54.04(6) (1995) and G. L. c. 51, § 59. Fyntrilakis sought a declaration that the primary results are invalid as well as injunctive relief ordering both a new Democratic primary election to be held forthwith, and that the June 22, 1999, general election be postponed.

The Superior Court judge held hearings on June 9, 11, 16, and 17, 1999. At the June 16 hearing, Keough sought to elicit testimony regarding residency from approximately twenty-five of the inactive list voters who had been permitted to vote at the primary without filling out residency affirmations. Keough wished to inquire of them whether, at the time of the primary, they met the municipal residency requirements necessary to complete the written affirmation and thereby qualify to vote.[3] Fyntrilakis filed a motion in limine to preclude all inactive list

---

[2] There has been some confusion as to the number of inactive list voters that were allowed to vote without completing affirmations of continuous residency. The parties have stipulated that there are three affirmations for the city of Springfield on record. The Superior Court judge found that forty-nine inactive list voters voted without completing residence affirmations in the city of Springfield, then subtracted the three affirmations from this number, resulting in forty-six inactive list voters who voted without completing affirmations. Fyntrilakis has stated that this calculation by the court was harmless error, that forty-nine inactive list voters voted without completing affirmations, and that three inactive list voters in addition did complete affirmations. However, in their briefs, all of the parties state that forty-six inactive list voters were allowed to vote without completing affirmations. Although we refer to the number as forty-six, the exact number is not pertinent to our analysis. The trial court judge must ultimately determine the number of inactive list voters that were allowed to vote without completing affirmations of continuous residency.

[3] At the hearing Keough's counsel made this offer of proof:

"What I would like to say, knowing this trial, should it have to go forward, we felt it would be incumbent to resolve it speedily. In anticipation in determining what the Court would do we did, in fact,

voters from so testifying which, after hearing, the judge allowed. The judge thereafter declared the May 25, 1999, primary election invalid, concluding that there had been a "substantial failure to comply with election laws," because the affirmation's purpose was "not only to restore voter's names to an active voting list, but also to safeguard against fraud." She found that forty-six voters had substantially failed to comply with a material provision of G. L. c. 51, § 59, and 950 Code Mass. Regs. § 54. 04(6), but noted that "this substantial noncompliance [was] caused not by the voters, but by the election officials." She held that "eliciting testimony from the inactive voters at this stage would not rectify such noncompliance" and that the proposed testimony from inactive list voters who voted at the primary would frustrate the sanctity of the secret ballot and carried a great potential for fraud. She accordingly ordered that a new Democratic primary election for the Ninth Hampden District State Representative seat be held at the earliest possible date and enjoined the holding of the general election for State Representative which was scheduled for June 22, 1999.

The Secretary and Keough petitioned a single justice of this court for interlocutory relief pursuant to G. L. c. 231, § 118, and for a stay of the injunction pursuant to Mass.R.A.P. 6, as amended, 378 Mass. 930 (1979). A final judgment thereafter entered in the Superior Court and the Secretary and Keough filed notices of appeal. Pending appeal, the single justice stayed that portion of the judge's injunction which ordered that a new primary election be held and ordered the appeal expedited.

The question before us is whether the Superior Court judge erred

subpoena 45 witnesses yesterday. I have a rough count of about 23, 24 have responded and are present here today. They fall into the category of alleged inactive voters who may not have filed affidavits of continuous residency. And we were calling them for the residency, of curing that defect on the grounds that it was an omission of a ministerial function by a city official in that they were allowed to vote, but not required to fill out the affidavit. And, therefore, we suggest that their vote and their franchises that are at issue in this particular case — there is no intention on the part of myself and my co-counsel to ask any of these voters for whom they voted. We are clearly prohibited from doing that under all of the case law. The only issue we would consider to be relevant, did they continuously reside in either Springfield or Chicopee at the time that they cast their vote for office. That is the purpose for which we have subpoenaed them."

in invalidating the primary election without first hearing limited and potentially curative postelection testimony as to the residency, at the time of the primary, of inactive list voters who, through the apparent dereliction of local election officials, were permitted to vote without first having completed requisite affirmations of residency. Fyntrilakis takes the position that the statutory and regulatory requirement of written voter affirmation of current and continuous residency signed under the penalties of perjury is a mandatory substantive prerequisite for voting by one on the inactive voter list. On this view, failure to comply with such requirement, for whatever reason, cannot later be cured. The Secretary and Keough join in arguing that the absence of residency affirmations in these circumstances is not necessarily a fatal error but one that can potentially be cured by postelection testimony concerning whether the voters in question met the residency requirements for voting at the time of the primary.

We look first to the language and purpose of G. L. c. 51, § 59, and 950 Code Mass. Regs. § 54.04(6), viewed in the context of the larger statutory scheme. Under G. L. c. 51, §§ 37-37A, a voter who does not respond to the annual local census has his or her name placed on an "inactive voters" list.[4] The inactive voters list was first established by St. 1993, c. 475, § 14, and first implemented in 1995. St. 1993, c. 475, § 58.

When a voter's name is placed on the inactive voters list, the voter must be sent a notice containing information about how the voter can remain eligible to vote.[5] See G. L. c. 51, § 37. The notice must be sent "on or before the first Monday of June in each year," which, in this case, was after the May 25, 1999,

---

[4]"The name and address of a voter that is not entered in the annual register pursuant to section thirty-seven shall be maintained on an inactive voters list until such voter has failed to vote in two consecutive biennial state elections and has thereafter been notified, by mail, of such removal from the inactive voters list." G. L. c. 51, § 37A, inserted by St. 1993, c. 475, § 14.

[5]"The registrars . . . shall, on or before the first Monday of June in each year, send notice in writing to each voter of the preceding year whose name has not been entered in the annual register of the current year that the name of such voter may be removed from the voting list if the voter fails to respond to the notice and does not vote in the next two biennial state elections following the mailing of such notice. Such notice shall (1) be postage prepaid; (2) contain a preaddressed and postage prepaid return card; (3) be sent by forwardable mail; (4) instruct the voter to return the card before the last day to register if the voter did not change residence from the city or town; and (5) contain additional information about remaining eligible to vote, as prescribed

primary. G. L. c. 51, § 37. When the name of a voter who presents himself at a polling place to vote does not appear on a voting list, the first paragraph of G. L. c. 51, § 59, as amended through St. 1993, c. 475, § 24, provides that

> "the presiding officer shall attempt to identify such voter and his right to vote at such polling place by consulting the inactive voters list . . . and then, if necessary, by communicating with the board of registrars by telephone or other means at his disposal. If the presiding officer is then satisfied that such voter is entitled to vote, he shall issue a certificate in a form supplied by the registrars, stating the name, residence and party enrollment, if any, of the voter so identified, and such certificate shall be signed by such presiding officer."

The implementing regulation, 950 Code Mass. Regs. § 54.04(6)(a), provides in this regard that "[t]he presiding officer shall allow such inactive voter to vote upon written affirmation by the inactive voter of his current and continuous residence in the municipality, (or, at a state primary or state election, residence in the municipality within the previous six months,) signed under the penalties of perjury."[6] Since the election in question was a State primary, an inactive list voter was eligible to vote once she signed a written affirmance under pain of perjury that, as of the date of the primary, she either currently resided in the municipality or had resided there within the preceding six months. See 950 Code Mass. Regs. § 54.04(6).

If, as here, local election officials did not comply with the foregoing provisions when confronted with inactive list voters wishing to vote, the question becomes what the consequence of such noncompliance should be, a question that neither the statute nor the regulation addresses. The principles governing the construction of election laws, however, are well established. So in 1932, the court stated that "[t]he regnant design of all election laws is to provide expeditious and convenient means for expression of the will of the voters free from fraud." *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 276 (1932). The

by the state secretary." G. L. c. 51, § 37, as amended through St. 1996, c. 454, § 8.

[6] "[A] sufficient supply of blank certificate forms, must be immediately available to the presiding officer at every polling place." 950 Code Mass. Regs. § 54.04(6)(c) (1995).

purpose of election laws is to " 'ascertain the popular will and not to thwart it. The object of election laws is to secure the rights of duly qualified electors and not to defeat them.' This must be borne in mind in the construction of such statutes, and the presumption is that they are enacted to prevent fraud and to secure freedom of choice, and not by technical obstructions to make the right of voting insecure." *Id.* at 277, quoting from *Blackmer* v. *Hildreth*, 181 Mass. 29, 31 (1902). "Irregularities in the conduct of an election, not shown to violate the substantive end for which the election was held, do not invalidate the result." *Id.* at 278. It is a fundamental principle that a "voter who has cast his ballot in good faith should not be disenfranchised 'because of the failure of a ministerial officer to perform some duty imposed upon him by law.' " *McCavitt* v. *Registrars of Voters of Brockton*, 385 Mass. 833, 841-42 (1982), quoting from *Meyer* v. *Keller*, 376 So. 2d 636, 638 (La. App. 1979). See *Connolly* v. *Secretary of the Commonwealth*, 404 Mass. 556, 563 (1989); *Colten* v. *Haverhill*, 409 Mass. 55, 61 (1991).[7]

In view of this, we think the purpose of § 59 and of its implementing regulation is, as the Secretary suggests, to provide a mechanism for ensuring that voters on the inactive list who present themselves to vote meet the residency requirements for voting and not, as Fyntrilakis suggests, to provide a mechanism assuring that voters on that list who do not complete affirmations of residency will not vote. To be sure, the statute and regulation contemplate the completion of an affirmation prior to voting but nothing in either expressly prohibits voting where the affirmation was not obtained. Where the affirmation was not obtained, the vote cast by the inactive list voter may nonetheless still be valid if the voter in fact at the time met the residency requirements for voting. The Secretary and Keough maintain that this may be shown through limited postelection testimony concerning the voters' residence,[8] while Fyntrilakis contends that allowing such testimony is neither permissible nor prudent.

---

[7]Neither *Walsh* v. *Secretary of the Commonwealth*, 430 Mass. 103 (1999), nor *Hurst* v. *State Ballot Law Commn.*, 427 Mass. 825 (1998), which concern the construction of the referendum provisions of art. 48 of the Amendments to the Massachusetts Constitution, and of G. L. c. 53, § 22A, governing referendum petitions, affects the result we reach here.

[8]While the Secretary and Keough agree that postelection testimony should be heard, it became clear at argument that they part company on the issue of the burden of overcoming the presumption that the votes cast by the inactive list voters and counted by election officials were valid. It is clear that "[v]otes

It is true, as the Secretary notes, that the Legislature has determined in other circumstances that postelection testimony, apparently including that of voters, is permissible to determine the validity and result of the election. See G. L. c. 51, § 59A (escrow ballots); G. L. c. 54, § 85A (challenged voters); G. L. c. 54, § 96 (absentee ballots); G. L. c. 54, § 135, final par. (recounts). The Legislature has not made any provision in this regard, however, in connection with challenged inactive list voters. We need not linger long on whether the omission is of significance or whether the Legislature has taken the more general view that such postelection proceedings are not so cumbersome, so fraught with the risk of fraud, or so burdensome to the right to vote as to outweigh their value in determining the validity and outcome of an election.

We are struck instead by the fact that we know of no case, and none has been brought to our attention, which prohibits the admission of postelection testimony concerning the circumstances of voting by particular voters, except as to the absolute prohibition against inquiring for whom voters voted. To the contrary, we find instructive and are guided by the line of election law cases which shows reliance without ado by the Supreme Judicial Court on postelection testimony.

In *Maiewski* v. *Registrars of Voters of Deerfield,* 347 Mass. 681 (1964), ninety-two voters failed to comply with statutory requirements for write in votes, their votes were not counted, and Maiewski's opponent won by twenty-five votes. The trial court judge heard testimony from some of the noncomplying voters and found that, notwithstanding their missteps, they had intended to vote for Maiewski. The Supreme Judicial Court af-

counted by election officials are presumed to be legal. The challenger has the burden of overcoming that presumption." *McCavitt,* 385 Mass. at 846. The Secretary maintains that Fyntrilakis, as the challenger, bears the burden but has made a prima facie showing of substantial noncompliance with the election laws sufficient to overcome the presumption by proof that a significant number of voters whose names appeared on the inactive voters list were permitted to vote without completing affirmations of residency, contrary to law. The Secretary in essence contends that such votes are thereby necessarily rendered suspect and should be considered invalid unless adequate curative evidence, which it is for Keough to present, can demonstrate that the voters were in fact at the time eligible to vote. Keough, in contrast, argues that, since Fyntrilakis bears the burden of proving lack of substantial compliance with the election laws, he must in effect prove that the inactive list voters were not eligible to vote. The parties did not address this issue in their briefs, but we think the Secretary's view is correct.

firmed, stating that the "finding was warranted on the excerpts of testimony included in the record and on the exhibits." *Id.* at 682.

In *McCavitt* v. *Registrars of Voters of Brockton, supra,* the dispute was whether certain absentee ballots should be invalidated due to the voters' failure to follow statutory procedures for absentee voting. The appellate record indicates that the trial judge took testimony from some of those voters and made findings substantially based on that testimony. The court held that the trial judge had erred insofar as he required certain of the voters whom he had found to have voted illegally to disclose for whom they had voted. The court, however, discussed and appears both to have assumed the propriety of and to have relied upon postelection evidence about the circumstances of the voters' voting. We note that the court also ruled that the trial judge had erred in excluding evidence that a person who had signed illegibly the ballot in a notarial capacity was in fact a notary with an unexpired commission. 385 Mass. at 841 n.8.

In *Connolly* v. *Secretary of the Commonwealth, supra,* the court observed that, in resolving disputes about the validity of absentee ballots, they had had "the benefit of testimony" from a voter and the judge's findings "as to the circumstances of the ballots' execution." 404 Mass. at 570. The court also agreed with the trial judge's ruling that one in-person ballot was properly counted. The trial judge found, on the basis of evidence that the voter had recently moved, that, although that voter's name did not appear on the voting list for the ward and precinct in which she voted, the election official properly allowed her to vote. *Id.* at 567 n.8.

In light of this consistent practice, we discern no basis in principle for requiring the exclusion of limited postelection testimony as to the inactive list voters' residency at the time of the primary. Fyntrilakis argues, however, that the Superior Court judge's concern for the potential of fraud in such testimony is well placed. She ruled voter testimony inadmissible because "[w]hile I am specifically making no finding anticipating fraud in the proposed testimony, it must be noted that the potential for fraud is great. . . . There is nothing that would preclude either a witness falsely testifying about their residency at the time of the election or a voter who was not in compliance with the residency requirement refusing to testify." It was because of

this very concern for the potential of fraud, he argues, that the Supreme Judicial Court excluded certain votes in *McCavitt* and *Connolly.*

Addressing the last point first, it is well to remember that the contested ballots at issue in *McCavitt* and *Connolly* were absentee ballots. When the concern is potential fraud, there are significant and telling differences between ballots cast by absentee voters and those cast by inactive list voters. Absentee ballots are filled out at some place other than the polling place, while inactive list voters come to the polling place and cast their votes in person and in the presence of election officials. Since absentee ballots are not cast at the polls, the potential for fraud, undue pressure being placed on the voter, or someone other than the voter completing the ballot is much greater. This is likely why the Legislature enacted such intricate procedures to be followed by absentee voters. See G. L. c. 54, § 92. This underscores, too, the court's concern in cases involving challenged absentee ballots that there have been a high degree of compliance with the statutory safeguards against fraud. Compare *Connolly,* 404 Mass. at 567 n.8. We think the potential for fraud, while not eliminated, is significantly lessened when votes are cast in person at the polling place, even by voters on an inactive voters list.

Addressing the judge's stated reasons for concern about potential fraud, we consider first her worry that nothing would preclude witnesses from testifying falsely about their residency at the time of the election. All that is presently known about the inactive list voters is that their names were on an inactive voters list and that they nonetheless voted without having first completed the affirmation required by statute. We do not know whether the inactive list voters were aware before voting of the inclusion of their names on the inactive voter list and what, if any, information was provided them or required of them by election officials before permitting them to vote. Evidence concerning voter residence at the time of or within six months prior to the primary does not on its face seem particularly difficult to establish or .especially susceptible to fabrication. Dissembling on the subject is not impossible, of course, but any witness who testified would first take an oath and would presumably testify and offer pertinent supporting documentation as to his residency at relevant times. He would then be subject to cross-examination and impeachment, whether by documents

such as, for example, driver's license, utility bills, leases, and postal or other official records, through other witnesses, or by such other means as are traditionally employed in adversarial evidentiary proceedings. Credibility determinations and findings necessary to determine whether any, and if so, how many, of the inactive list voters met the residency requirements when voting will be for the trial court judge to make.

The judge was also concerned that "[t]here is nothing that would preclude . . . a voter who was not in compliance with the residency requirement [from] refusing to testify." This concern admits of simple resolution. If a voter refuses to testify, absent credible evidence as to that voter's satisfaction of the residency requirement when voting at the primary, the vote is not valid because of noncompliance with the statutory affirmation of residency requirement. Were the judge to decide that the evidence had not established that a sufficient number of the inactive list voters in fact met the residency requirements at the time they voted, then a new primary election would be warranted.[9]

Finally, we think the challenger's concerns that such testimony might compromise the sanctity of ballot secrecy or deter subpoenaed inactive list voters from voting in the future have little basis in fact. As to the former, the voters who testify will not be asked in any manner for whom they voted and the secrecy of the ballot will not be endangered. The latter concern is purely speculative and ignores the reality that, unless such evidence is taken and the violation of election laws is thereby possibly rectified, the disenfranchisement of almost five thousand other voters is assured.

We conclude that the results of the primary election were prematurely invalidated and that it was error not to have heard evidence relevant to a determination of whether the challenged voters met municipal residency requirements at the time they

---

[9]Fyntrilakis's initial complaint challenged the primary result on additional grounds as well which the judge must also decide upon remand. Accordingly, the number of contested votes that must be found valid for the election results to stand cannot now be determined. In order to determine the number of contested votes that must be found valid, the trial court judge must calculate the difference between the number of votes that are contested and the margin of victory in the primary, and then add one. See *Connolly*, 404 Mass. at 561; *Colten*, 409 Mass. at 57. For example, if forty-six votes are ultimately contested, the court would subtract thirty-two from forty-six and add one, resulting in fifteen.

voted. The judgment is vacated and the matter is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*