Garsh, J.
This matter comes before the court on plaintiffs request for injunctive and declaratory relief. Plaintiff, Richard Penta (“Penta”), asks the court to declare invalid the recount of a municipal election in the City of Revere for the office of City Councillor from Ward 1, to order that a Certificate of Election be issued to Penta, or, in the alternative, to order a new election. Penta claims that the counting of more ballots at the recount than there were either voters according to the “check-in” and “check-out” lists or ballots cast according to the voting machine count evidences fundamental error which requires that there be a new election. Penta also claims that the Board of Election Commissioners (“Commissioners”) made erroneous rulings on certain protested errors. Finally, Penta claims that the failure of fifteen persons, whose names were on the inactive list of registered voters, to have executed an affirmation of current and continuous residence demonstrates substantial noncompliance with the election laws requiring a new election.[2]
Hearings were held on December 18, 19, 22, and 23, 1997. Twenty-three witnesses testified. The parties stipulated to numerous facts. Each of the disputed ballots was reviewed de novo by this court.
FINDINGS OF FACT
Based on all the credible evidence and reasonable inferences drawn from that evidence, the court finds the following facts:
On November 4, 1997, a municipal election was held in the City of Revere. The plaintiff was a qualified candidate listed on the ballot for the office of Ward 1 City Councillor. The only other qualified candidate listed on the ballot for that office was Nicholas Maraño.
No one ran a “sticker campaign” for the office. As of May 30, 1997, eight persons with the surname Maraño, including the defendant Nicholas Maraño, resided in Cily of Revere. Five of the eight resided in the defendant Nicholas Marano’s household. None of the other Mara-nos in Revere have the first name of Nicholas; indeed, none have a first name that begins with N.
The voters used ballots that were processed through automatic, electronic, optical scanning voting machines. The logic and accuracy of the machines were tested a week before the election; the machines were determined to be in perfect working order and kept in a safe until election day. According to the automatic voting machines used on election night, a total of 2,496 ballots were cast. The machine counts all ballots that have not jammed — blank ballots, ballots with candidates written-in, absentee ballots, regularly completed ballots — and sorts them into bins, the front bin for blank ballots and those with write-in candidates, the rear bin for the remaining ballots. Each ballot that is counted is canceled; the cancellation consists of a red strip, located either on the front or back of the ballot, with the ward and precinct number, i.e. 1-2, being printed in red at intervals for the entire length of one side of the ballot.
If the voter uses a marker other than the one provided or makes an exceedingly light mark or a mark other than in the space between the two printed halves of the broken arrow, the machine may treat the ballot as a blank, but it will still be processed and counted. If a ballot jams at a certain point while a voter is inserting it into the machine, the machine will not process the ballot and will print out the following message:
BALLOT JAMMED WHILE READING
Remove Ballot and return it to voter.
(Voter may need new ballots)
***BALLOT HAS NOT BEEN PROCESSED!!!***
On election day at each precinct, the machine was set at zero before any ballot was inserted. When this suit was commenced, Penta alleged that the count of the number of voters who voted at the election pursuant to the official records of the City, including all persons who voted in person and by absentee ballots, totaled 2,493, three less than the number of ballots that had been counted by the machines. After careful review of the official records, all parties have stipulated that the check-in sheets, in fact, reflect that 2,496 voters cast ballots; exactly the same number of ballots were counted by the machines.[3]
Each voter received a ballot with the names of candidates printed on it. In addition, the ballot provided write-in spaces for each office equal to the number of people to be elected. Immediately above the space for writing in names, there appears the following statement: ‘To vote for a person whose name is not printed on the ballot, write the candidate’s name on the line provided and complete the arrow." Beside each name printed on the ballot and beside each write-in space is a broken arrow pointing toward the candidate’s name or write-in space. To vote for a candidate, the voter is instructed to complete the missing center portion of the arrow and is provided with a black marker to do so. The November 1997 election was only the second time that the residents of Revere voted using this system requiring arrows to be completed. It was first used during the primary election in September of 1997. There was no primary for Ward 1 Councillor.
As a matter of law, 950 CMR §54.04(4), (5), (7), and (8), policy, and practice, in order to obtain a ballot, an individual must state his or her name and address. The name is checked by a poll worker against the lists of registered voters and repeated. A red check is made next to the person’s name on the voting list and a ballot is handed to the voter. The poll workers also keep a running tally of the number of ballots that have been handed out. The poll workers followed these procedures in handing out ballots.
As a matter of law, 950 CMR§54.04(13)-(15), policy, and practice, after filling out the ballot, the voter repeats his or her name and address to another poll *108 worker who repeats it and checks off the name on a second duplicate list of registered voters. The voter then inserts the ballot into the scanner. The poll workers at Precincts 1, 2, and 3 in Ward 1 acted in conformity with these procedures. With the exception of the name of one voter, the poll workers in Precinct 4 complied with these procedures. I infer that the name of one voter, who was properly given a ballot after checking in, was inadvertently not checked off the check-out list at Precinct 4.
At each of the precincts, absentee ballots were fed into the machines by a Commissioner. At that time, pursuant to 950 CMR §54.04(27)(d), a red check was made on the voting lists.
There are two types of voting lists. One contains the list of active voters, namely all voters entered on the annual register; the other is a list of inactive voters. The list of inactive voters is by ward and precinct. It is organized by street name and contains, by street number, a name, party registration, and “inactive date.”
Affirmation forms of current and continuous residence with a warden’s certificate conforming to the requirements set forth in 950 CMR §54.04(6)(a) were provided by the Commissioners to each precinct and, in addition, one of the Commissioners conducted training sessions before the election explaining to the wardens and the clerks the requirement to secure affirmations from persons whose names appear on the list of inactive voters. The form, blanks of which were contained in the same envelope as the list of inactive voters for that precinct, states the following:
AFFIRMATION OF CURRENT AND CONTINUOUS RESIDENCE
You have appeared to vote on election day and your name either does not appear on the voting list or appears as an inactive voter at_ since_.
You are still eligible to vote today, if you have registered to vote in Revere in the past, and sign an affirmation under penalties of perjury, that you are still a current resident of Revere and have continuously been a resident in Revere since either the date you were listed as an inactive voter above, or (if your name is not on the voting list) since the date that you were last listed as a registered voter. If you have moved within Revere, please state your old address and your new address below.
I,_am a current resident in Revere at_and have continuously resided in Revere since the date of my inactive voter status listed above, or since the date that I was last listed as a registered voter.
Signed under penalties of perjuiy
Print Name
If you have moved within the Revere, please list your old address and your new address below:
Old Address_
New Address_
At a state primary or election only, you may vote in Revere where you last resided until the expiration of six months from the date that you moved from Revere.
Warden’s Certificate
This is to certify that the name of the voter listed above appeared on the inactive voting list for Ward _, Precinct_, Party_or was determined by the Board of Election Commissioners to be qualified to vote in this precinct in the election held on November — , 199 — .
Attest:_
In Precinct 1, thirteen persons whose names appeared on the inactive list cast ballots. Each of the thirteen signed an affirmation of current and continuous residence. Each of the thirteen signed affirmations was attested to by the warden.
In Precinct 2, eleven persons whose names appeared on the inactive list cast ballots. None of the eleven signed an affirmation of current and continuous residence. Indeed, only one of the eleven was asked to sign anything at all, and what she signed remains a mystery.[4] At Precinct 2, the warden’s daughter was the clerk. Both are experienced election officials. The affirmations sent by Commissioners to Precinct 2 were totally disregarded; 1 infer that they were discarded because, after the election, they were not returned to the Commissioners with the inactive list of voters.
In Precinct 2, when a person appeared to vote whose name was not on the list of active voters, that person was directed to the warden or to the clerk. If either of these individuals located the person’s name on the list of inactive voters, she instructed the poll worker to distribute a ballot. It was not the practice of either the warden or the clerk to require any form of identification, picture or otherwise, and they did not generally do so.[5] Neither the warden nor the clerk inquired of the voter as to whether such person had continuously resided in Revere since the last date of ascertained registration or at what addresses, if any, they had resided in the interim. Neither the warden nor the clerk contacted the Commissioners with respect to any person seeking to vote whose name appeared on the inactive list. Neither the warden nor the clerk asked any person seeking to vote whose name appeared on the inactive list to provide any information under the penalties of perjury. There is no evidence that the right of each of these eleven voters to vote at Precinct 2 was determined by the warden, the clerk, or the Commissioners. The warden is friendly with a strong supporter of the candidacy of Nicholas Maraño. The warden and the clerk were, at a minimum, grossly negligent in the performance of their duties.[6] While the *109 evidence of their flagrant dereliction would support an inference of fraud, on this record, I decline to draw that inference.[7]
There is insufficient evidence to conclude that each of the eleven persons whose names appeared on the inactive list would have signed the affirmation form had it been proffered to them. Ten of the eleven testified as to their current address in Revere. Only three of those ten testified as to their address as of the of the day of the election and as to their continuous residence in Revere at that address for several decades. The other seven were not asked. It cannot be determined, on this record, whether the others had continuously resided in Revere since the last date of their ascertained registration in Revere. Indeed, there is no evidence as to whether or not their names appeared elsewhere on an active list of voters. One of the persons whose name appears on the inactive list did not testify in this proceeding. In addition to not knowing whether that person would have completed, and been entitled to complete, the required affirmation, the Court is unable to determine if the person who appeared at Precinct 2 and obtained a ballot actually was the individual whose name appears on the list of inactive voters.
In Precinct 3, four persons voted whose names appeared on the inactive list. Three of the four signed an affirmation of current and continuous residence and each affirmation was attested to by the warden. The fourth, who has resided in Revere for the past three years,[8] was not asked to complete an affirmation and did not do so. She was not asked to orally swear to the truth of the information contained in the affirmation form. The voter’s handwriting appears nowhere on the affirmation form containing her name. The voter’s name and address was inserted by an election worker at the precinct on the affirmation which begins “I_am a current resident. . .” On the line under “Signed under penalties of perjury," the letters “Bun” appear in script that has been crossed out. No other signature is contained on that line, but, on the next line, above the instruction, “Print name,” a name has been printed. The affirmation form was attested to by the warden in Precinct 3. The warden’s signature is made with a different pen, reinforcing the erroneous impression that the blanks that were filled in on the certificate were completed by the voter. I infer that the warden, who did not testify, inadvertently omitted to provide the certificate and then sought to remedy her oversight by completing the affirmation herself or directing that someone under her control complete the form. Although a fake signature was not put on the affirmation, the completion of the affirmation constitutes a serious mistake in judgment. The attested to affirmation was completed in such a way that it would appear to anyone reviewing the affirmation as if the voter herself had filled in all the requisite information, had completed the affirmation of current and continuous residence, and had printed, rather than signed, her name under the statement: “Signed under the penalties of peijuiy.” I find, however, no credible evidence of actual fraud.
In Precinct 4, thirteen persons voted whose names appeared on the inactive list. Ten of the thirteen signed an affirmation of current and continuous residence, and each of the ten signed affirmations was attested to by the warden. Three of the thirteen neither signed such an affirmation nor were asked to do so. They were given ballots without being asked to orally swear to the truth of the information contained in the affirmation form. The warden, who was new to her position, was confused about what forms had to be completed by voters. Someone in the precinct, although there is no evidence as to the identity of such person,[9] partially completed three affirmation forms. They are not attested to by the warden. The actual voters’ handwriting appears nowhere on the three affirmations containing their names. Although no name was signed or printed under the heading “Signed under the penalties of perjury,” the affirmations appear as if they have been partially completed by the voter. In each case a name (but not address) has been inserted in the affirmation that begins, “I am a current resident in Revere . ..” No one checked with the Commissioners concerning the entitlement of any of the three individuals to vote. I find, however, no credible evidence of actual fraud.
Two of the three individuals who cast ballots in Ward 1, Precinct 4 did not, in fact, live in that ward and were not entitled to cast a ballot for Ward 1 City Councillor. With respect to the third individual, it cannot be determined, on this record, whether she had continuously resided in Revere since the last date of her ascertained registration in Revere.
After the polls were closed and the last vote was cast, in each precinct the warden used a key to open the access panel on the machine. The warden pressed a button to produce a tape printout of the vote totals. Next, the warden opened the rear bin and put all the canceled ballots into a carrying case, after which the warden opened the front bin. The ballots were removed from the front bin and sorted. The canceled blank ballots were put into the same carrying case as the canceled write-in ballots after they were counted. Finally, after counting the number of unused and uncanceled ballots, these unused ballots were placed in the same carrying case, unsegregated from the canceled ballots. The total of used and unused ballots equaled the total number of ballots received at each of the precincts. A police officer was present overseeing this entire process. The carrying case was sealed and locked with a special locking mechanism. There is no direct evidence that, before the carrying case was sealed, any ballot was placed into the carrying case which came from a source other than one of the machines’ bins and the unused, blank, uncanceled ballots at the polling stations. I do not draw the inference *110 from the difference between the number of ballots counted by the machines that any extra ballots were snuck into the carrying case that were not machine canceled or unused, blank, and uncanceled from the polling stations.
The locked carrying cases from each of the precincts were taken to the Commissioners where their seals were inspected; all were found to be in order. The cases were placed into a safe guarded by a police officer. No one tampered with the carrying cases after they were sealed at the precinct.
After the results of the November election indicated that the plaintiff had lost the election by eight votes, Penta filed a petition for a recount by hand pursuant to G.L.c. 54, §135. The recount commenced on November 18, 1997 and was concluded on November 25, 1997.
The carrying cases were opened for the first time at the recount. In order to accomplish the recount, ten tables were set up. In addition to Penta, one of the mayoralty candidates, and one of the candidates for councillor at large had also sought a recount. One of the Commissioners sorted the ballots into batches of fifty. He did not inspect both sides of the ballots as he created batches of fifty ballots to confirm that the ballots had been canceled. Accordingly, he included in the batches several unused, blank, uncanceled, ballots because such ballots had been put unsegregated into the same carrying case as the canceled blank votes. A blank, canceled, and counted ballot looks identical to a blank, uncanceled, and uncounted ballot but for the red numbers on one side of the ballot.
Runners delivered batches of fifty ballots to each table where they were tabulated in the presence of each candidates’s designated representatives; the representatives were also permitted to inspect each ballot. Penta’s counsel was present at the recount. If a ballot was protested, it was brought by one of the runners to the Commissioners, who ruled on the protest.
When the Ward 1, Precinct 1 ballots were counted, it was discovered that the counters had counted more ballots than had been processed on election night. According to the machine, 595 ballots were cast in that precinct. At the recount, 609 ballots were counted. The number of blanks increased by thirteen from 25 to 38, while the number of write-ins and ballots for Maraño stayed the same. The number of ballots counted for Penta increased by one.
When the Commissioners learned of the discrepancy, ballots were already being distributed to the tables from Precinct 2. Convinced that uncanceled, unused, blank ballots, which had been placed in the same container as the canceled, blank ballots, must have gone to the tables by mistake, the Commissioners suggested that the block envelopes of fifty be retrieved from each of the tables, that all the uncanceled ballots be removed, and that the count begin again. Penta’s counsel would not consent to this attempt to remedy an apparent error in distribution of unused, blank ballots to the counting tables.[10]
When the Ward 1, Precinct 2 ballots were counted, it was ascertained that the counters had counted more ballots than had been processed on election night. According to the voting machine, 577 ballots were cast in Precinct 2. At the recount, 589 votes from Precinct 2 were counted. The number of blanks increased by fourteen from 39 to 53, while the number of write-ins decreased by two; the number of ballots counted for Maraño decreased by two, and the number of ballots counted for Penta increased by two.
The Commissioners were much more careful in compiling the blocks of fifty ballots from Precincts 3 and 4. Ballots were inspected to insure that uncanceled ballots were not sent to the tables for counting. A staff member double-counted the ballots sorted by the Commissioner before they were given to the runners. The total number of ballots scanned by the machines and the number tallied in the recount were identical for Precincts 3 and 4.
Penta did not protest the counting of any ballot on the grounds that it had not been canceled. No uncanceled ballot was challenged on any grounds. There is no credible evidence of fraud with respect to the distribution of the ballots to the counting tables during the recount.
Based on all the circumstances, I infer that the counting tables received fourteen unused, uncanceled, blank ballots from Precinct l[11] and twelve unused, uncanceled, blank ballots from Precinct 2,[12] and that each was counted during the recount as a blank ballot without any effect on the outcome of this election. The discrepancy in the recount total and the number of ballots cast is solely the result of human error by one of the Commissioners who sorted the ballots into batches of fifty.
The final recount tally was as follows:
Richard Penta 1135
Nicholas Maraño 1139
Blanks 243
Write Ins 5
Total 2522
Eleven ballots were protested by the candidates during the recount. Eight remain in dispute.
RULINGS OF LAW
Discrepancy in Total Number of Ballots Counted
“ “Whenever the irregularities or illegality of [an] election is such that the result of the election would be placed in doubt, then the election must be set aside’ and the judge must order a new election.” McCavitt v. Registrars of Voters of Brockton, 385 Mass. 833, 850 (1982). Penta has demonstrated no material irregularity or substantial noncompliance with the election laws. On the facts of this case, the appearance of more ballots at the recount tables than number of ballots cast does not raise serious questions concerning the security of the ballots, how they became part of the recount, or access to ballots by *111 third parties. The appearance of the unused, uncanceled, blank ballots at the recount tables did not affect the determination as to who is the winner of the election. Accordingly, Penta is not entitled to an order that a new election be held based upon the discrepancy in number of ballots counted at the precincts versus the number of ballots counted at the recount.
Protested Ballots
Of the eleven ballots protested at the recount, Penta and Maraño continue to protest eight ballots. The determination of the legal effect of a protested ballot is a question of law. McCavitt, 385 Mass. at 839. The recount by the Commissioners is not final; this court must make a de novo determination of the voter’s intent. Id.
In reviewing ballots de novo, “[t]he cardinal rule . . . is that if the intent of the voters can be determined with reasonable certainty from an inspection of the ballot, in light of the generally known conditions attendant upon the election, effect must be given to that intent and the vote counted . . . provided the voter has substantially complied with the requisites of the election law ..." Id. at 838 (citing O’Brien v. Election Comm’rs of Boston, 257 Mass. 332, 338 (1926)). In order to determine the voter’s intent, the judge should consider the character and location of the mark on the ballot and the conditions attendant upon the election. Id. In addition, the judge should inspect each ballot for patterns that reveal the voter’s intent. Id. If the voter’s intent cannot be fairly and satisfactorily ascertained, the ballot cannot be rightly counted. Id.; G.L.c. 54, §106.
I have reviewed the four disputed ballots in which no name was inserted in the write-in portion of the ballot. Each ballot was meticulously examined. I described each ballot and its markings for the record. Counsel was also given an opportunity to review each ballot. I made rulings regarding each ballot.[13] Votes were given to a candidate only if the voter’s intent was reasonably certain after a consideration of the factors described above. If the voter’s intent was not ascertainable, the ballot was recorded as a blank. After my careful examination, two votes were counted in favor of Maraño; one vote was counted in favor of Penta and the remaining ballot was counted as a blank.[14]
On three of the remaining challenged ballots, the voters, in addition to designating a vote for Nicholas Maraño as a preprinted candidate, also wrote in the name “Nicholas Maraño” in the space provided for write-ins. On the last challenged ballot, the voter, in addition to designating a vote for Nicholas Maraño as a preprinted candidate, wrote in “N. Maraño” in the space for provided for write-ins. None of the four ballots contain the address of the person being written-in.
Each of the four ballots was meticulously examined. I described each ballot, its markings, and its writings for the record. Counsel was also given an opportunity to review each ballot. After a consideration of the factors described above and careful examination of the four ballots, I found that the intent of three of the voters can be ascertained with reasonably certainty and that each of these three voters reasonably certainly intended to cast a vote for the defendant Nicholas Maraño. The voters may have chosen an inappropriate way to signal what candidate they wished to be elected by completing the arrow next to the printed name and also writing in his name, but signal it they did. “(T]he right to vote is a sacred privilege. Every rational intendment is to be made in favor of its rightful exercise.’’O’Brien, 257 Mass. at 338. With respect to one of the four ballots, I found that the voter’s intent could not be fairly determined, and that ballot was recorded as a blank.
Penta argues that, even if the voters’ intent can be determined, the ballots may not be counted because G.L.c. 54, §106 is drafted in the disjunctive and requires ballots to be disregarded if a voter has marked more names than there are persons to be elected to an office. Pursuant to G.L.c. 54, §106, ”[i]f a voter marks more names than there are persons to be elected to an office, or if his choice cannot be determined, his ballot shall not be counted for such office.” The statutory language would, indeed, preclude a judge from attempting to ascertain the intent of the voter by, for example, comparing the clarity of the marks where one printed name is checked off and a different name written in. On the three ballots at issue, the voters did not mark more “names" than “persons to be elected” since they wrote on the ballot the same name as the one they had marked with the arrow. There is no conflict — real or implied — in the write-in name and the name marked elsewhere on the ballot. Accordingly, the requirement to disregard ballots where a voter has voted for more names than persons to be elected does not require these ballots to be disregarded.
Finally, Penta argues that these three ballots may not be counted because the four voters did not substantially comply with the requisites of election law. G.L.c. 54, §42 provides, as follows:
Blank spaces shall be left at the end of the list of candidates for each different office ... in which the voter may insert the name and address of any person not printed on the ballot for whom he desires to vote for such office; provided, however that a mistake in stating the address of such person shall not invalidate a vote if the address stated is sufficient to indicate the person for whom the vote was intended.[15]
Just as the failure of a voter to include the residence of a write-in candidate is not a fatal defect despite the statutory language, Maiewski v. Board of Registrars of Voters of Deerfield, 347 Mass. 681, 683 (1964), so too it is not fatal that a voter has marked his ballot for the name of a preprinted candidate and has, as well, written in the name of the same candidate.
Although during my de novo recount, I disagreed with the Commissioners on two ballots, because those rulings were to count a ballot for Maraño that had been deemed *112 by the Commissioners to be a blank and to deem a ballot to be blank that had been ruled by the Commissioners to be a vote for Maraño, the overall effect of the de novo determination is to leave the results of the recount vote counts unchanged. Penta is not entitled to an order that a Certificate of Election be issued to him.
Ballots Cast by Voters on the Inactive Voters List
Without question, there has been substantial noncompliance with election laws. Fifteen persons were wrongly provided with ballots that they then cast.
G.L.c. 51, §59 provides as follows:
Whenever the name of a voter, appearing at a polling place to vote in a[n]... election... does not appear on a voting list . . . the presiding officer shall attempt to identify such voter and his right to vote at such polling place by consulting the inactive voters list. . . and then, if necessary, by communicating with the board of registrars by telephone or other means at his disposal. If the presiding officer is then satisfied that such voter is entitled to vote, he shall issue a certificate in a form supplied by the registrars, stating the name, residence and party enrollment, if any, of the voter so identified, and such certificate shall be signed by such presiding officer.
Regulations promulgated by the Office of the Secretary of the Commonwealth spell out in greater detail the requirements that must be met before a person whose name does not appear on the list of active voters may be given a ballot.[16] These regulations, 950 CMR §54.04(6), provide as follows:
(a). . . If the name, address, or party enrollment of a person claiming the right to vote appears on the voting list as an inactive voter, the presiding officer shall allow such inactive voter to vote upon written affirmation by the inactive voter of his current and continuous residence in the municipality . . . signed under the penalties of perjuiy . . .
(b) The registrars must determine persons to be entitled to vote under 950 CMR 54.04 and M.G.L.c. 51, §59 whenever such persons have registered to vote in that city... in the past and affirm in writing, signed under the penalties of peijury, that they have continuously resided in the city... unless the registrars affirmatively establish, by evidence other than failure to respond to the street listing under G.L.c. 51, §4, or failure to respond to a notice under G.L.c. 51, §37, that the person has not in fact continuously resided in that city . . . The written affirmation shall be on a form which must be available at the polling place stating: “I am currently a legal resident of (city or town), and have continuously been a legal resident here since (last date of ascertained registration). Signed under the penalties of peijuiy.” For the purpose of ascertaining past registration, the registrars must check all available records for at least the previous three years.
(c). . . To carry out the communications required by 950 CMR 54.04 and M.G.L.c. 51, §59, a properly functioning telephone or other equivalent communications, and a sufficient supply of blank certificate forms, must be immediately available to the presiding officer at every polling place . . .
The requirement that one whose name appears on the list of inactive voters complete a written affirmation of current and continuous residency signed under the penalties of perjury as a precondition to receiving a ballot is mandatory. This requirement is a significant safeguard against fraud. Here, at least fifteen voters substantially failed to comply with a material provision of the election laws because they were never provided with the necessary affirmations to complete and sign. Other safeguards were not followed as well. The irregularities do not fall into the category of “a mere technical variance from statutory requirements which might be deemed inconsequential or harmless.” Davis v. Board of Registrars of Voters of Billerica, 357 Mass. 615, 619-20 (1970).
Under these circumstances, at a minimum, eleven[17] of the fifteen ballots cast without the required affirmations may not be counted.[18] In considering such ballots, the court is concerned with “[t]he preservation of the enfranchisement of qualified voters and of the secrecy of the ballot, the prevention of fraud, and the achievement of a reasonably prompt determination of the result of the election.” McCavitt, 385 Mass, at 844. While a voter should not be disenfranchised if the voter substantially complies with the election law,[19] where, as here, the voter has not substantially complied with the requisites of the election law, the noncomplying votes must be disregarded. Id. at 845.
The mere fact that voters were prevented from complying with the law because of the wardens’ failures to provide them with the required affirmations does not preclude striking their votes. Although a court, of course, should be “reluctant to disenfranchise these voters based on omissions of a third person,” Colten v. City of Haverhill, 409 Mass. 55, 61 (1991), here whatis missing is a document that the voter, not some third party, is required by law to complete. In Colten, the Court considered, inter alia, whether the omission of certain witnesses’ addresses from absentee ballot envelopes should invalidate those ballots. Id. at 61. The Court viewed such an omission as technical and insubstantial where it could have been rectified by the officials themselves from public records in their custody. Id. By contrast, none of the wardens in the three precincts where ballots were given out to persons without requiring that affirmations be completed had the information that they needed to ascertain in public records. Moreover, it is not clear from this record how many of the voters who did not complete an affirmation could have completed an affirmation as to current and continuous residency as of the date of the election.
*113 It is not enough to counter, as do the defendants, that Penta has not proven that any of these voters or wardens were involved in fraud. If “in the absence of any allegation of fraud, . . . (substantial compliance is sufficient,” id., it follows that where, as here, there is not substantial compliance, it is insufficient. In McCavitt, it was also argued that there was no evidence that any of the absentee voters who failed to have their signatures notarized were involved in fraud or intentional wrongdoing. McCavitt, 385 Mass. at 843. Notwithstanding the lack of such evidence, the Court held that the ballots of absentee voters who marked their ballots outside the presence of a notary must be disregarded. Id. at 845.
Similarly, in Connolly v. Secretary of the Commonwealth, 404 Mass. 556, 565 (1989), it was held that ballots should not be counted where the envelopes with ballots from a nursing home had the voter’s name in the space entitled “voter’s name printed” but lacked “the voters’ address, the location where ballots were voted, the date when ballots were mailed, and most importantly, the voters signed affidavits” (emphasis added). In such circumstances the ballots were found to be “facially invalid” because the “(t]he potential for fraud in such circumstances is too great.” Id. In Connolly, the Court also held that an absentee ballot which, although witnessed, had not been signed by the voter, should not have been counted. Id. at 567.
The “potential for fraud” in the circumstances of this case is also “too great.”[20] Numerous people were permitted to vote without making the required statement under penalties of perjury and without being asked to provide the required information to the election officials. Even if it were proper to elicit the testimony of voters as to whether they in fact would have been able to make the required affirmation — testimony which was generally here not elicited — the declarations of a voter after he has voted, and after the election has closed, with regard to his qualifications to vote would appear to be particularly suspect. Permitting such testimony may open a door to fraud by allowing a voter who may be dissatisfied with the result of the election to affect the determination of a contest by his own after-the-election declarations. The interest in speedy determination of the results of an election also would be defeated were a candidate, after an election, able to remedy material and substantial departures from the election laws by securing the favorable testimony of voters as to their bona tides.
Nicholas Maraño is the winner of the Ward 1 City Council seat by only four votes. At least eleven votes were wrongly counted.[21] As a result of substantial irregularities or illegality, the outcome of the election for Ward 1 City Council has been placed in doubt. A new election must be held.
ORDER
For the foregoing reasons, it is hereby ORDERED that a declaration enter ordering the Board of Election Commissioners of the City of Revere to hold a new election for the office of Ward 1 City Councillor at the earliest possible date.

The issue concerning the votes cast by persons on the inactive list was not raised in the plaintiffs trial memorandum. Given the need to expedite these proceedings, in lieu of requiring the filing of an amended complaint, the court has construed paragraph fourteen of the complaint as encompassing a claim that some of the ballots cast were from voters who had improperly been given ballots without completing the required affirmations. All parties stipulated that this issue had been raised in a general fashion in the recount petition. That petition, therefore, “is sufficient to preserve the issue for judicial determination.” McCavitt v. Registrars of Voters of Brockton, 385 Mass. 833, 840 (1982) (failure to make individual protests to specific absentee ballots during recount proceeding does not result in waiver of an objection to counting such ballots where petition alleged generally that “absentee ballots and applications therefor are in error”)..Here, moreover, all parties agree that the Commissioners lacked the power, as part of the recount proceeding, to declare the election invalid by virtue of noncompliance with the election laws. The court rejects the argument that Penta is barred by estoppel, laches, or waiver from seeking a new election on the grounds of substantial noncompliance with G.L.c. 51, §59 and regulations promulgated thereunder. See G.L.c. 56, §59 (Superior Court has jurisdiction in equity to enforce the provisions of chapters fifty to fifty-six and to grant relief formerly available in equity or by mandamus). Cf. Marre v. Reed, 775 S.W. 2d 951, 954 (Mo. 1989) (holding that the vote of an unqualified voter is an “irregularity” within the meaning of a state statute permitting contest of an election’s result by a candidate on the basis of irregularities occurring in the election even though such vote was not challenged at the precinct level).

The check-out sheets total 2,495. Penta does not claim that the discrepancy of one between the check-in sheets and the machine tally, on the one hand, and the check-out sheets, on the other hand, is legally significant.

This witness credibly testified that she was asked by one of the election officials to sign a piece of paper with her name and address. The City has been unable to locate that paper.

Only one of the eleven persons whose name appeared on the inactive list was asked to show identification.

Penta has not proven, by a preponderance of the evidence, that the warden actively promoted Marano’s candidacy by suggesting to voters how they should vote.

Although Penta has not proved fraud by a preponderance of the evidence, neither have the defendants disproved fraud by a preponderance of the evidence. The evidence would equally support contrary inferences.

The “inactive date" provided for this person on the list is April 23, 1997.

The warden credibly testified that she did not recognize the partially completed affirmation form at all.

Counsel for the other candidates participating in the recount also did not consent. The Cily was not willing to start the recount afresh without consent fearing that it might run afoul of a statute or regulation if it did so without consent.

The fact that the number of blanks in Precinct 1 increased by thirteen during the recount and not fourteen does not mean that fourteen unused, uncanceled blanks were not received at the counting tables. During the recount, Penta received one additional vote in Precinct 1.1 infer that this vote came from one of the twenty-five ballots that had been deemed *114 to be a blank at the precinct. The results of the recount In the mayoralty race do not cast any doubt on there having been fourteen unused, uncanceled, blank votes counted from Precinct 1. Although, in that race, the number of blanks increased only by eleven, there were fifteen blanks at the end of the recount. The votes counted for John Peter Jordan (“Jordan”) stayed the same. Robert J. Haas, Jr. received four additional votes in the recount, which I infer came from the one write-in which disappeared and three of the four ballots that had been deemed to be blank at the precinct.

The results of the recount in the mayoralty race do not cast any doubt on there having been twelve unused, uncanceled, blank votes counted at the recount from Precinct 2. Although the number of blanks increased only by seven in that race, there were twenty blanks at the end of the recount. In the recount of Precinct 2, the votes counted for Jordan increased by four and the votes counted for Haas increased by one; I infer that these five votes came from the five of the thirteen ballots that had been deemed to be blank at the precinct.

The rulings made on the record are incorporated into this decision. The transcript containing those rulings has been made part of the record of this case.

The court has considered and finds unpersuasive the arguments made in plaintiffs Supplemental Trial Memorandum filed sifter the court orally ruled on the question of intent with respect to each of the disputed ballots.

See also 950 CMR §54.04(10).

 Regulations have the force of and effect of law. E.g., Purity Supreme, Inc. v. Attorney General 380 Mass. 762, 775 (1980); Quinan v. Famous Players-Lasky Corp., 267 Mass. 501, 516 (1929). Nothing in G.L.c. 51, §37A or the National Voter Registration Act of 1993, 107 Stat. 77 renders unenforceable any of the requirements contained in 950 CMR §54.04(6).

Assuming that a voter may, after the election, cure such substantial noncompliance by testifying in court as to continuous residence, itself a dubious proposition, only four of the voters have done so. Of the eleven that remain, there is no disagreement that two of the ballots should not have been counted in this race. With respect to a third ballot, as discussed above, this court has been unable to ascertain even that it was cast by the person whose name was checked off the inactive list.

Of course, those ballots cannot be identified.

See, e.g., Connolly v. Secretary of the Commonwealth, 404 Mass. 556, 564 (1989) (votes properly counted where blank for voter’s signature on application contains signature followed by initials since inference properly drawn that witnesses signed the affidavit on voter's behalf and initialed the signature because the voter was unable to sign the affidavit); McCavitt, 385 Mass. at 845 (ballot need not be struck of voter who marked ballot in presence of notary, placed it in the specially provided envelope, and executed affidavit on the envelope in the presence of a notary, but who failed to exhibit unmarked ballot to the notary before voting).

The facts, taken together, convey a strong appearance of impropriety. The affirmations sent to Precinct 2 inexplicably disappeared; experienced election officials at that precinct ignored unambiguous legal requirements as well as clear direction from the Commissioners. When questioned, the warden had very little recall as to what had transpired on election day; and, because the clerk was a close family member, there was no independent person to serve as a check on the warden. In other precincts, affirmations were improperly and misleadingly completed by persons other than the voters. Not to require a new election to be held under these circumstances would undermine public confidence in the election laws.

If the testimony of the four individuals as to their continuous residency should be disregarded, then fifteen ballots were wrongly counted.